ALFRED HARFST ET AL., Appellants, v. A. J. HOEGEN ET AL.—163 S. W. (2d) 609.

Court en Banc, June 13 1942.

Rehearing Denied, July 7, 1942.

*Irwin, Bushman & Buchanan* for appellants.

*H. P. Lauf, John O. Bond, John P. Peters* and *Paul Hoegen* for respondents.

810

*Roy McKittrick*, Attorney General, and *Arthur O'Keefe*, Assistant Attorney General, for Lloyd W. King, State Superintendent of Schools.

DOUGLAS, J.—This is a suit by parents of public school children, against members of a school board, seeking an injunction against the use of school funds for purposes alleged to be sectarian and religious. From a decree granting part of the relief sought, and refusing to grant more, plaintiffs have appealed. The suit involves the Missouri constitutional guaranties of religious liberty and pre-

sents questions which have never before been considered or decided by our appellate courts.

Some years ago in the town of Meta, in Osage County, the Catholic Parish of St. Cecelia established its usual parish or parochial school, which was conducted under the direction of the parish priest. The teachers were members of the Sisters of the Most Precious Blood, a Catholic teaching order, who came from St. Mary's Institute of O'Fallon at O'Fallon, Missouri, the motherhouse and novitiate for the training of teachers for parochial schools. The school building adjoined the parish church and had two school rooms on the first floor and a school room and a chapel on the second. After some time, and about ten years ago, this parish school was taken into the State public school system by the school board of the Meta school district as a public grade school. From then on it has been and is now supported by public funds. At that time the textbooks and the course of study prescribed by the State Superintendent of Schools were adopted, but otherwise the school seems to have been conducted as a parochial school in the same manner as before its inclusion in the public school system. It was continued under the same name, the St. Cecelia School, and in the same building, the three school rooms being rented from the parish priest by the school board. The same teachers or other Sisters of the same religious order were engaged and are paid by the school board and now constitute the teaching staff of the school. It is still referred to as the ''Catholic school.''

Harmony prevailed among the people of the school district about the conduct of this school until 1939 at which time there was a consolidation of another school district with the Meta district and the abandonment of the school in the other district. This action seems to have culminated in some bitterness between the peoples of the two districts and led to the filing of this suit. Almost all of the persons engaged in this controversy are of the same religion, Catholic. The questions involved do not arise from a strike between persons of opposing religious beliefs, but come from a dispute between those of the same faith.

We find the usual school day commencing with prayer in the morning. After prayer the pupils are marched, one room at a time, to the Catholic church next door for Holy Mass. After Mass the pupils are marched back to their school rooms where they receive religious instruction. In this they study the Catholic catechism and the child's Catholic Bible. On one or two days of each week the parish priest gives religious instruction to the pupils in the mid-morning, either at the church or in the schoolhouse chapel. On Friday afternoons the pupils are again marched to the church for confession. In the quarterly ''Teacher's Report to the Parents'' the subject ''Religion'' is included under ''Branches Pursued'' and a grade in this subject is given to each pupil.

Sister M. Berchmans, one of the present teachers, testified that the Sisters of the Most Precious Blood dedicate their lives to teaching the young which includes the teaching of the Catholic faith as well as the teaching of the usual secular educational subjects. She had been previously and was then teaching the Catholic faith to her pupils in the St. Cecelia public school. As accessories to the religious instruction, the school rooms have in them pictures and symbols of the Catholic faith, and there are holy water fonts for the benefit of the pupils at the doors of the school rooms. The one hundred or more pupils at this school are usually all of the Catholic faith, but in some years there have been one or two Protestant children enrolled there.

The school board maintains a second grade school in Meta which is attended entirely by Protestant children. The enrollment there is about one-half the number in the St. Cecelia school. The manner in which this school is conducted is not here in controversy, but the evidence shows that its facilities are not equal to those of the St. Cecelia school, and that Catholic children have been ordered by the school board to leave it and attend the St. Cecelia school.

Plaintiffs, who are parents of school children, taxpayers and residents of the school district, after stating the facts set out above allege that the members of the school board, the defendants, are maintaining a parochial school at public expense, contrary to our Constitution. They ask that the board be enjoined from using public funds: in support of a parochial school; in employing as teachers persons garbed in the habiliments of a religious order; in employing sectarian teachers. The answer of the school board is a general denial.

The chancellor found that sectarian religion was being taught in the school by the Sisters and also by the parish priest with the knowledge of the board members. However, in his decree he fails to give the broad relief asked for but confines himself to enjoining what appellants contend are mere side issues. He enjoined the use of religious textbooks and accessories such as pictures and symbols and the holy water fonts, but he did not enjoin the teaching of sectarian religion. He did not enjoin the maintenance of a sectarian school by public officials at public expense. He did enjoin the parish priest from teaching within the school building, but he did not enjoin the payment of public funds to the teachers of religion. Under the decree as it now stands it is argued that defendants may continue to ignore the constitutional provision insuring the freedom of worship.

Plaintiffs have appealed. They have first assigned as error the failure of the chancellor to enjoin the school board from paying public funds to the teachers of what the chancellor found to be a sectarian school. In passing on this particular assignment we are compelled to review briefly our constitutional guaranties of religious freedom which are necessarily involved in deciding this case, and which are

alleged to have been openly violated, for the reason we hear this case de novo and determine what decree should have been entered.

With the adoption of the Federal Bill of Rights[1] the whole power over the subject of religion, at that time, was left exclusively to the State governments.[2]

Previously there had been controversies in the various colonies over the governmental support of the church, and the complete separation of the church from the state did not really come until the formation of our federal system of government,[3] although the Virginia Bill of Rights had earlier guaranteed freedom of worship. At that time there was declared the principle which is of the warp and woof of democracy, namely the people must enjoy religious freedom and religious equality. This principle has stood out as a guiding star in the growth and development of our form of government and has contributed to its solidarity. It is as vital to our people as the guaranty of civil liberty and political equality. Because of it, devotion to religious beliefs according to the ▆▆ dictates only of one's conscience without molestation of forcible direction became possible, thus permitting an unhampered growth of religious conviction of any sort and of every denomination. There could be no governmental discrimination in favor of or against any sect; each became entitled under the law to enjoy equal rights in a broad field. Yet, religion was in no way taken away from the individual. It has been recognized in the courts that generally we acknowledge with reverence the duty of obedience to the will of God.[4] In the preamble to our Constitution the people of our State acknowledge our ''profound reverence for the Supreme Ruler of the Universe'' and our gratitude for His goodness.[5] But yet, beginning with our first Constitution,[6] we have persistently declared ''that all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences;'' and, ''that no human authority can control or interfere with the rights of conscience.''

The fact that this is a case of first impression in this State is of itself an evidence that the policy separating religion from government can be maintained. It also demonstrates unusual restraint both on the part of church and state in view of the important roles played by the various pioneers of religion in the settlement of our State and

[1]Amend. 1. "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." Now absorbed in the Fourteenth Amendment: Meyer v. Nebraska, 262 U. S. 390; Pierce v. Society of Sisters, 268 U. S. 510; Cantwell v. Connecticut, 310 U. S. 296; Minersville District v. Gobitis, 310 U. S. 568.

[2]Story, Const. of the U. S. (1891), Sec. 1879.

[3]Reynolds v. United States, 98 U. S. 145. Goddard: "The Law in its Relation to Religion," X Mich. Law Review, l. c. 164.

[4]United States v. Macintosh, 283 U. S. 605. And see Cooley Const. Limitations (1927) p. 976.

[5]Mo. Const. 1875.

[6]Mo. Const. 1820, Art. XIII, Sec. 4.

in its transition from the frontier. A history starting with the first Jesuit Missionaries, followed in time by the frontiersman generally with a scorn of religion, and, finally, a period of Protestant revivals, has no doubt presented opportunities for vigorous controversy.[7] But where such have occurred, settlement must have been made without resort to law. In other states numerous cases involving many phases of such controversies have reached the courts. There are decisions on public aid to a sectarian school, employment of a sectarian teacher, use of a church for school purposes, permitting the Bible in a school library, reading of the Bible with or without comment in a school, and so on. Each case necessarily turns on the particular constitutional provision of the state in which the case arises.[8]

Missouri follows generally the usual pattern of religious guaranties and safeguards in its Constitution.[9] We have, as mentioned above, the provision for freedom of worship according to one's own conscience without control or interference of his rights of conscience. It is apparent therefore, that under our system of education the inclusion of the St. Cecelia school in the public school system and its maintenance as a part of and an adjunct to the parish church in its religious teaching and where children of every faith may be compelled to attend and have attended, constitutes a denial of our guaranty of religious freedom. The fact that attendance at Mass is customarily before school hours or that religious instruction may be given during recess periods or that the participation of a non-Catholic child in these services may not be required does not make such conduct lawful in view of this provision.[10] Particularly is this true under circumstances as in this case where the pupils must arrive and leave at the same time in the school busses. This court has already said that "it certainly could not have been the design of the

---

[7]See Houck, History of Missouri, Chap. 28; and "Religion," Missouri Guide Book, Federal Writers' Project.
[8]See cases reported and annotations thereto on "Sectarianism in Schools" in 5 A. L. R. 841; 20 A. L. R. 1334; 31 A. L. R. 1121; 57 A. L. R. 185. And see 16 C. J. S., Const. Law, Sec. 206c.
[9]Art. II, Sec. 5. "That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no person can, on account of his religious opinion, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience; that no person ought, by any law, to be molested in his person or estate, on account of his religious persuasion or profession; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of this State, or with the rights of others."
Art. II, Sec. 6. "That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same."
[10]Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A. L. R. 841.

legislature to take from the parent the control of his child while not at school, and invest it in a board of directors or teacher of a school." And we asked: "May they not prescribe a rule which would forbid the parent from allowing the child to attend a particular church, or any church at all?"—assuming that the question answered itself and reduced the argument to absurdity.[11] By the common law, control of children is parental and the father could "delegate part of his parental authority to the tutor or schoolmaster" said Blackstone, 1 Com. 452, 3. Now by statute the school board has been given certain powers, and it behooves the board to point to a statute, when its will and that of the parent conflict.[12] This it has failed to do. And certainly the school board may not employ its power to enforce religious worship by children even in the faith of their parents. Furthermore, the segregation of the Catholic from the non-Catholic children and their mandatory attendance at one or the other of the two grade schools according to their religion, whether the schools be of equal or of unequal facilities, likewise constitutes a denial of complete religious freedom. The cases relied on by respondents may be distinguished on the facts; one involved only the garb of the teacher and two were about reading the Bible.[13]

There is another constitutional inhibition which respondents do not observe. It forbids a school district to make payments from any public fund to sustain any private or public school controlled by any sectarian denomination.[14] Respondents might argue that the St. Cecelia school is controlled by the school board and not by the church, but we find from the record that the nominal supervision by the school board is but an indirect means of accomplishing that which the Constitution forbids.[15] The statement of the county superintendent of schools that "We put the St. Cecelia parochial school into the public school system" is fully borne out by the facts in evidence. It

---

[11]Dritt v. Snodgrass, 66 Mo. 286.

[12]Wright v. Board of Education, 295 Mo. 466, 246 S. W. 43.

[13]Gebhardt v. Heidt, 66 N. D. 444, 267 N. W. 128; Kaplan v. School District, 171 Minn. 142, 214 N. W. 18, 57 A. L. R. 185; Wilkerson v. Rome, 152 Ga. 762, 110 S. E. 895, 20 A. L. R. 1334.

[14]Art. XI, Sec. 11. "Neither the General Assembly nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the State, or any county, city, town or other municipal corporation, for any religious creed, church or sectarian purpose whatever."

[15]See Knowlton v. Baumhover, supra; Cook County v. Chicago Industrial School for Girls, 125 Ill. 540, 18 N. E. 183, 1 L. R. A. 437; and see "Schools," 24 R. C. L., Sec. 49.

was not only put there but it was maintained there with public funds[16]

But our Constitution goes even farther than those of some other states. In addition to the provisions already mentioned we have still another. Art. II, Sec. 7, says: "That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion or any form of religious faith or worship." Thus, we have an explicit interdiction ▮ of the use of public money for a *teacher* of religion *as such* which has been violated by the Board. In the instant case it is true that the Sisters followed the course of secular instruction prescribed for public schools but in addition they also instructed in the faith of their religious belief as their obligation required them to do. The Sister Superior testified that the members of her order have dedicated their lives to teaching and to the Catholic faith; to both the religious training and education of children; to teach no other faith but that of their religion; to devote themselves to a religious life. She also testified that before coming to the St. Cecelia school she had taught in parochial schools and that the teaching was the same in them as in the St. Cecelia school except that in the parochial schools there was even more time devoted to instruction in religion. "I couldn't teach any differently," she stated. She then told of the religious instruction she was giving to her pupils in the St. Cecelia public school using the Catholic cathechism and the child's Catholic Bible as texts.

From her testimony we must conclude that the members of her religious order, their lives dedicated to the training of children both in religion and education, come within this constitutional interdiction as teachers of religion and payment to them from public school funds is forbidden.

In reaching this conclusion we recognize that the members of these noble teaching orders are inspired only by the most unselfish and highest motives; that parochial education is an embodiment of one of the highest ideals that man may enjoy. The Supreme Court of the United States found that parochial education has been "long regarded as useful and meritorious."[17] In the instant case it is admitted by all parties that the Sisters are fully qualified according to the standards set by the superintendent of instruction as teachers of a public school. We know of the great educational institutions conducted by the Jesuits and other Catholic Orders and of their high

---

[16]Millard v. Board of Education, 121 Ill. 297, 267 N. E. 128, cited by respondents held that under the evidence there was no ground for equitable relief under the Illinois constitutional provisions and Dunn v. Chicago Industrial School, 280 Ill. 613, 117 N. E. 735, also cited, held that in effect no aid was given by the State.

[17]Pierce v. Society of Sisters, 268 U. S. 510.

standards of excellence, St. Louis University being a leader among them. We recognize as well the great need of spiritual training not only in our own country, but throughout this troubled world. The right of freedom of worship, which at this time is being denied to the peoples of two foreign governments in particular, must be restored before the world is again secure. Nevertheless, the question confronting us is one only of law; of upholding our Constitution as it is written which, as lawyers and judges, we have dedicated our professional life to do. The constitutional policy of our State has decreed the absolute separation of church and state, not only in governmental matters but in educational ones as well. Public money, coming from taxpapers of every denomination, may not be used for the help of any religious sect in education or otherwise. If the management of this school were approved, we might next have some other church gaining control of a school board and have its pastors and teachers introduced to teach its sectarian religion. Our schools would soon become the centers of local political battles which would be dangerous to the peace of society where there must be equal religious rights to all and special religious privileges to none. The faithful observance of our constitutional provisions happily makes such a condition impossible.

It is of no purpose to discuss or decide other questions raised except to point out that the long acquiescence of appellants in the management of the school cannot make such management proper.[18] No one may waive the public interest;[19] the constitutional provisions are mandatory and must be obeyed.[20]

The members of the school board have unintentionally but unquestionably violated our constitutional provisions in the respects noted.

We commend the candor of all parties and it has eased the labors of the Court.

Plaintiffs in this appeal have also assigned as error the failure of the chancellor to enjoin the employment of the Sisters as teachers on the ground the Sisters wear the garb of their religious Order while teaching. In view of the conclusions we have reached it becomes unnecessary to consider or discuss this assignment.

This case must be remanded with directions to the chancellor to supplement the decree for plaintiffs, giving them additional injunctive relief in conformity with the views expressed in this opinion.

It is so ordered. Opinion adopted en Banc June 13, 1942. All concur except Gantt, J., absent.

[18]Knowlton v. Baumhover, supra.
[19]DeMay v. Liberty Foundry Co., 372 Mo. 495, 37 S. W. (2d) 640; 16 C. J. S., Const. Law, Sec. 89.
[20]State ex rel. United Railways Co. v. Public Service Comm., 270 Mo. 429, 192 S. W. 958.