AMERICANS UNITED, a corporation, et al., Respondents,

v.

H. Lang ROGERS et al., Appellants,

and

Independent Colleges and Universities of Missouri, Intervenor-Appellant.

No. 59410.

Supreme Court of Missouri, En Banc.

July 26, 1976.

Rehearing Denied Aug. 6, 1976.

John C. Danforth, Atty. Gen., by Daniel P. Card, II, Asst. Atty. Gen., Jefferson City, R. H. McRoberts, Sr. and Thomas C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, for appellants.

Frank Susman, Susman, Schermer, Willer & Rimmel, St. Louis, for respondents.

Flavius B. Freeman, Neale, Newman, Bradshaw & Freeman, Springfield, Wayne L. Millsap, Millsap, Weil, Eyerman & Schenberg, Clayton, for amici curiae.

MORGAN, Judge.

On January 26, 1976, the trial court entered a judgment declaring that: "The statutory scheme contained in Missouri Revised Statutes, Sections 173.200 to 173.235, popularly known as 'The Financial Assistance Program' and providing for tuition grants to college students at certain approved public and private colleges, is hereby declared to be unconstitutional and void under the guarantees and rights provided within the First Amendment of the United States Constitution and provided within Article I, Sections 6 and 7, Article III, Section 38(a), Article IX, Section 8, and Article X, Section 3, all of the Missouri Constitution (1945)." The state Coordinating Board for Higher Education and certain Independent Colleges and Universities, defendants, have appealed. Jurisdiction of the cause is vested in this court by virtue of Article V, § 3, of the constitution of this state. We reverse.

The challenged statutory scheme was enacted by the General Assembly in 1972. During the 1975–76 school year, approximately 10,000 college students received financial assistance while enrolled in 57 different institutions in Missouri—26 public and 31 private—approved by the Coordinating Board for Higher Education. The latter in § 173.210 is designated as the administrative agency for implementation of the program and is empowered to promulgate reasonable rules and regulations to effectuate the same. The Board has the sole authority to " . . . select qualified recipients to receive financial assistance, make such awards of financial assistance to qualified recipients and determine the manner and method of payment to the recipient."

§ 173.200 is entitled "Purpose of sections 173.200 to 173.235" and reads: "The general assembly, giving due consideration to the historical and continuing interest of the people of the state of Missouri in encouraging deserving and qualified youths to realize their aspirations for higher education, finds and declares that higher education for residents of this state who desire such an education and are properly qualified therefor, is important to the welfare and security of this state and the nation, and consequently is an important public purpose. The general assembly finds and declares that the state can achieve its full economic and social potential only if every individual

has the opportunity to contribute to the full extent of his capabilities and only when financial barriers to his economic, social and educational goals are removed. It is therefore, the policy of the general assembly and the purpose of sections 173.200 to 173.235 to establish a financial assistance program to enable qualified full-time students to receive nonreligious educational services in a public or private institution of higher education of their choice."

§ 173.205 contains definitions of academic year, approved private institution, approved public institution, coordinating board, financial assistance, financial need and full-time student. Two, therein, are of immediate and special interest:

"(2) 'Approved private institution', a non-profit institution, dedicated to education purposes, located in Missouri which: (a) Is operated privately under the control of an independent board and not directly controlled or administered by any public agency or political subdivision; (b) Provides at least a collegiate level course of instruction for a minimum of two years, leading or directly creditable toward an associate or baccalaureate degree; (c) Meets the standards for accreditation as determined by the North Central Association of Colleges and Secondary Schools; (d) Does not discriminate in the hiring of administrators, faculty and staff or in the admission of students on the basis of race, color, religion, sex, or national origin and is in compliance with the Federal Civil Rights Acts of 1964 and 1968 [42 U.S.C.A. §§ 2000a et seq., 3601 et seq.] and executive orders issued pursuant thereto; (e) Permits faculty members to select textbooks without influence or pressure by any source; * * * (6) 'Financial need', the difference between the financial resources available to an applicant as determined by the coordinating board, and the applicant's anticipated expenses, including tuition, mandatory fees, and board and room while attending an approved private or public institution of higher education. In determining need the coordinating board shall employ a formula similar to nationally recognized comprehensive mechanisms for

determining need, such as those of the American College Testing Program or the College Scholarship Service; . . ."

§ 173.215 lists the basic qualifications of an applicant and, in part, provides: "1. An applicant shall be eligible for initial or renewed financial assistance only if, at the time of his application and throughout the period during which he is receiving such assistance, he (1) Is a citizen of the United States; (2) Is a resident of the state of Missouri, as determined by reference to standards promulgated pursuant to section 173.140 [student loan program]; (3) Is enrolled, or has been accepted for enrollment as a fulltime undergraduate student in an approved private or public institution; (4) Establishes that he has financial need; (5) Has never been convicted in any court of an offense which involved the use of force, disruption or seizure of property under the control of any institution of higher education to prevent officials or students in such institutions from engaging in their duties or pursuing their studies; and (6) No award shall be made under sections 173.200 to 173.235 to any applicant who is enrolled, or who intends to use the award to enroll, in a course of study leading to a degree in theology or divinity."

§ 173.220 limits the amount of any grant or award to the least of (1) applicant's financial need, (2) one-half the tuition and mandatory fee charged at the institution attended or (3) the sum of Nine Hundred Dollars.

§ 173.230, in part, provides that "A recipient of financial assistance may transfer from one approved public or private institution to another without losing his eligibility for assistance . . ."

By stipulation, the parties have agreed as to the manner in which awards are distributed, to-wit: "Payment of the award is made by individual check in the amount of the award payable solely to the student. The Department [Board] sends the checks for all of the students attending each institution to the financial aid officer at the particular institution for distribution to the students, which, generally speaking, occurs

as follows: Each student is notified that his check is available at the cashier's window and present the necessary identification to claim the check. The student is expected by the institution to take care of any and all educational expenses such as tuition, fees, and room and board (where applicable) that might be owed to the institution at the time he receives the check. If the amount of the student's indebtedness to the institution equals or exceeds the amount of the check, the student normally endorses the check over to the institution and receives a receipt for having made such payment. If the amount of the check exceeds the student's indebtedness, the student normally endorses the check over to the institution and receives back cash or the institution's check for the difference between his indebtedness and the amount of the check. If all of the charges of the institution for tuition, fees, and room and board (where applicable) have been paid from other sources, the check is turned over to the student to be used by him as he may see fit. The payment of a student's obligations to the institution is a matter to be worked out between the student and the institution."

It seems agreed that forty of the fifty-seven institutions recipients now attend have no church affiliation whatever.

The judgment entered by the trial court reflects that it was predicated upon the following constitutional provisions.

*United States Constitution*, First Amendment (in part): Congress shall make no law respecting an establishment of religion . . .

*Missouri Constitution*:

Article I, § 6—That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same.

Article I, § 7—That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

Article III, § 38(a)—The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation, excepting aid in public calamity, and general laws providing for pensions for the blind, for old age assistance, for aid to dependent or crippled children or the blind, for direct relief, for adjusted compensation, bonus or rehabilitation for discharged members of the armed services of the United States who were bona fide residents of this state during their service, and for the rehabilitation of other persons. Money or property may also be received from the United States and be redistributed together with public money of this state for any public purpose designated by the United States.

Article IX, § 8—Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any county, city, town, or other municipal corporation, for any religious creed, church, or sectarian purpose whatever.

Article X, § 3—Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. All taxes shall be levied and collected by general laws and shall be payable during the fis-

cal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law.

As we approach our task, we express appreciation for the assistance of excellent briefs submitted by the parties, the Attorney General and Amici Curiae. To sustain their respective positions, each has presented every conceivable argument with a comprehensive review of what are identified as supportive precedents. Within the limitations of an opinion of reasonable length, an effort will be made to recognize all of the same.

■■■ When considering an attack on the constitutionality of a legislative enactment, we are guided by the established principle that: "The state constitution, unlike the federal constitution, is not a grant of power, but as to legislative power, it is only a limitation; and, therefore, except for the restrictions imposed by the state constitution, the power of the state legislature is unlimited and practically absolute. *Kansas City v. Fishman*, 362 Mo. 352, 241 S.W.2d 377 (1951). An act of the legislature is presumed to be valid and will not be declared unconstitutional unless it clearly and undoubtedly contravenes some constitutional provision. *State ex rel. Eagleton v. McQueen*, 378 S.W.2d 449 (Mo. banc 1964). Legislative enactments should be recognized and enforced by the courts as embodying the will of the people unless they are plainly and palpably a violation of the fundamental law of the constitution. *Borden Company v. Thomason*, 353 S.W.2d 735 (Mo. banc 1962)." *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority*, 518 S.W.2d 68, 72 (Mo. banc 1975). See also *State ex inf. Danforth v. Merrell*, 530 S.W.2d 209, 213 (Mo. banc 1975); *Hickey v. Board of Education of City of St. Louis*, 363 Mo. 1039, 256 S.W.2d 775 (1953) and *State ex rel. McClellan v. Godfrey*, 519 S.W.2d 4 (Mo. banc 1975).

It is obvious that the trial court, as shown by the judgment entry heretofore quoted, determined that the statutory scheme was "facially" unconstitutional under the proscriptions of both the federal and state constitutions, and we shall consider the same in that order.

### Federal.

Any need to analyze the manner in which the parties have interpreted the many federal church-state cases has been made unnecessary by the recent decision of the United States Supreme Court in *Roemer v. Board of Public Works of Maryland*, —— U.S. ——, 96 S.Ct. 2337, 49 L.Ed.2d 179 (decided June 21, 1976). Therein, such a review and analysis was made and the court upheld a statute of the state of Maryland which (as described in the syllabus thereof): ". . . authorizes the payment of state funds to any private institution of higher learning within the State that meets certain minimum criteria, and refrains from awarding 'only seminarian or theological degrees.' The aid is in the form of an annual fiscal year subsidy to qualifying colleges and universities, based upon the number of students, excluding those in seminarian or theological programs . . . and . . . requires that eligible institutions not use funds for sectarian purposes."

■ The court again approved and applied the three-pronged test found in *Lemon v. Kurtzman* (1971), 403 U.S. 602 at 612–613, 91 S.Ct. 2105, 29 L.Ed.2d 745, that state aid must have a (1) secular legislative purpose, (2) a primary effect other than the advancement of religion and (3) no tendency to entangle the state excessively in church affairs, as conditioned by the ultimate refinement thereof found in *Hunt v. McNair* (1973), 413 U.S. 734 at 743, 93 S.Ct. [2868], at 2874, 37 L.Ed.2d 923, that a constitutional violation may nevertheless be present ". . . when it [aid] flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." Other cases considered therein, upon

which the instant parties in part rely, are: *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Levitt v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) and *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

The statute approved in the Roemer case called for noncategorical grants of state funds directly to private institutions (not primarily awarding theological or seminary degrees) subject only to the one restriction that such funds not be used for "sectarian purposes." As to the recurrent argument, which is present in the instant case, that state funds even though strictly and faithfully expended for admittedly secular purposes do free other funds of an institution for sectarian purposes, the court said, l.c. (—— U.S., pp. —— – ——, 96 S.Ct. pp. 2344–2345): "The Court has not been blind to the fact that in aiding a religious institution to perform a secular task, the State frees the institution's resources to be put to sectarian ends. (Citing *Hunt v. McNair*, supra, 413 U.S. at 743, 93 S.Ct. 2868). If this were impermissible, however, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair. The Court never has held that religious activities must be discriminated against in this way." Of particular interest is the court's recognition, again, of the differences between college and precollege educational processes, l.c. at ——, 96 S.Ct. at 2347, that: " . . . college students are less susceptible to religious indoctrination; college courses tend to entail an internal discipline that inherently limits the opportunities for sectarian influence; and a high degree of academic freedom tends to prevail at the college level." Perhaps most descriptive of the basic problem itself is found in the court's observation, l.c. at

——, 96 S.Ct. at 2344, that: "A system of government that makes itself felt as pervasively as ours could hardly be expected never to cross paths with the church. In fact, our State and Federal Governments impose certain burdens upon, and impart certain benefits to, virtually all our activities, and religious activity is not an exception. The Court has enforced a scrupulous neutrality by the State, as among religions and also as between religious and other activities, but a hermetic separation of the two is an impossibility it has never required."

■ Under the guidelines noted, we seek to resolve the federal question.

1. Does the statutory program have a secular purpose? We think the answer is "Yes." The "purpose" as declared by the General Assembly in § 173.200 need not be repeated other than to note it is bottomed upon an appreciation of the fact an educated citizenry contributes to the welfare of the state as well as its economic and social potential; and, thus assisting those having aspirations for higher education, but lack sufficient financial resources, necessarily is a public purpose. As said in *Everson v. Board of Education*, supra, 330 U.S. at 7, 67 S.Ct. at 507: "It is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose." See also *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Cochran v. Louisiana State Board of Education*, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930). No federal case suggesting otherwise has been called to our attention nor have we discovered any. While considering a comparable "declaration of purpose" in *Hunt v. McNair*, supra, the court said 413 U.S. at 741, 93 S.Ct. at 2873: "The purpose of the statute is manifestly a secular one."

2. Is the primary effect of the statutory program other than the advancement of religion? We think the answer is "Yes." Hopefully, however, to avoid some repetition the reasons for our conclusion in this connection will await consideration of our state constitution, which not only proscribes "advancement of religion" generally but

other related activities specifically. Of special interest, however, is the court's statement in *Hunt v. McNair*, supra, at 742, 93 S.Ct. at 2874, that: "Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with religious affiliation has consistently been rejected."

3. Will implementation of the statutory program tend to entangle the state excessively in church affairs? We think the answer is "No." The statute approved in the Roemer case called for noncategorical grants to private schools to be used solely for secular purposes. At the end of each fiscal year, participating institutions had to file reports detailing each expenditure with a verification of its secular use. Under the statute now challenged, institutional involvement (with the state) is limited to verification that the student is actually in attendance at the particular school and repayment to the board of any refund due upon transfer or withdrawal of a student. The latter would appear to be less involved than the reporting under the statute of Maryland in the Roemer case. Nothing in the statutory program requires an institution to modify its rules and regulations or manner of providing college level teaching. Whether or not that mission is accomplished within the statutory "qualifications" is purely a statutory question and not one involving resolution of constitutional issues. "Excessive entanglement" does not arise necessarily because the challenged plan calls for annual legislative appropriations and "political divisiveness" is diminished, if not eliminated, when student eligibility does not turn on whether or not a public or private institution is attended. *Roemer* case, supra, —— U.S. pp. ————, 196 S.Ct. pp. 2352–2353.

The statutory program in question "facially" is not violative of the First Amendment to the United States Constitution.

*State.*

First, we consider the one point apparently not involving a church-state question stemming from Art. X, § 3, and Art. III, § 38(a). The former provision declares, in part, that "Taxes may be levied and collected for public purposes only . . ." and the latter provides in so far as of interest here that: "The general assembly shall have no power to grant public money or property . . . to any private person, association or corporation . . ."

■ Does the statutory program have a *public purpose*? Generally the answer could only be "yes" and citation of authority is unnecessary, because Missouri has always given education the highest of priorities. As said in the *Everson* case reference the federal question, it is much too late to suggest otherwise. The present program is somewhat unique in that it involves education at the collegiate level—other than providing the basic facilities. It is not a totally new question, however, as can be seen by reference to *State ex rel. Garth v. Switzler,* 143 Mo. 287, 45 S.W. 245 (banc 1898). Therein, the court disapproved of a "collateral succession tax" to endow free scholarship at the University of Missouri. It was rejected as an improper effort to legislate for a favored class solely to their own private use. Quoted with approval at 249 was a holding of the Supreme Court of Michigan in *People v. Salem,* 20 Mich. 452, that: ". . . the term 'public purpose,' as employed to denote objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit to follow." Proponents of the program challenge that such is the accepted present definition of "public purpose." It is of interest that the court recognized, l. c. 249, that what is and what is not a public purpose may turn on the course and usage of government and become sanctioned by time and acquiescence of the people. The court resolved that issue by declaring in 1898, l. c. 251, that: "Paternalism, whether state or federal, as the derivation of the term implies, is an assumption by the government of a quasi fatherly relation to the citizen and his family, involving excessive governmental regulation of the

private affairs and business methods and interests of the people, upon the theory that the people are incapable of managing their own affairs, and is pernicious in its tendencies. In a word, it minimizes the citizen, and maximizes the government. Our federal and state governments are founded upon a principle wholly antagonistic to such a doctrine. Our fathers believed the people of these free and independent states were capable of self-government,—a system in which the people are the sovereigns, and the government their creature, to carry out their commands. Such a government is founded on the willingness and the right of the people to take care of their own affairs, and an indisposition on their part to look to the government for everything. The citizen is the unit. It is his province to support the government, and not the government to support him. Under self-government, we have advanced in all the elements of a great people more rapidly than any nation that has ever existed upon the earth, and there is greater need now than ever before in our history of adhering to it. Paternalism is a plant that should receive no nourishment upon the soil of Missouri."

We doubt that a court in 1976 is free to accept and apply the very limited definition placed on "public purpose" in 1898 by the *Switzler* case. "Time" and "acquiescence" have made the same of historical interest only. Whether that change has been good or bad is not for this court to decide or comment upon. In any event, we are not inclined to drive the General Assembly back into the nineteenth century. "To be guided solely by whether a given activity had, at some previous time, been recognized as a public purpose would make the law static. Such a standard would compel us to retain in the law, as appropriate for public expenditure, activities which have ceased to be of public concern; and would prevent us from adopting new public functions regardless of how essential to the public welfare they may have become by reason of changed conditions. Nor can we be governed alone by the fact that only a portion of the public will be directly benefited, or benefited in a greater degree than the pub-

lic generally." *Laret Inv. Co. v. Dickmann*, 345 Mo. 449, 134 S.W.2d 65, 68 (banc 1939). See also *Kansas City v. Liebi et al.* (reported as *In re Kansas City Ordinance No. 39946*), 298 Mo. 569, 252 S.W. 404 (banc 1923), and *Bowman v. Kansas City*, 233 S.W.2d 26 (Mo. banc 1950).

Higher secular education today is unquestionably considered to be a contributing factor toward the betterment of society, and we find nothing in the constitution of this state prohibiting the legislative department from declaring the encouragement thereof a "public purpose." Certainly under modern day concepts such action can not be called "arbitrary" or "unreasonable." *State ex inf. Danforth ex rel. Farmers Electric Cooperative, Inc. v. State Environmental Improvement Authority*, supra.

■ Does the manner selected by the General Assembly to accomplish the stated purpose do violence to Art. 3, § 38(a)? We are not convinced that it does. The presence of a legitimate "public purpose" makes society or the people of this state the direct beneficiary of the expenditures. Certain recipients-students, as amici curiae, submit that they ". . . do not come before this Court to argue that there is no desirable private benefit inherent in the Act; indeed, they and thousands of their peers unquestionably benefit . . . However, benefit is to be distinguished from purpose and incidental private benefit does not preclude a transcendant public purpose * * it could be argued that private benefit to sufficient numbers of the citizenry creates a public purpose and that grants of public monies to 10,000 of Missouri's student-citizens may itself constitute a public purpose. Even disregarding that argument, the law is clear in Missouri that an overriding public purpose will not suffer constitutional death at the hands of incidental private benefit." Missouri cases cited throughout this opinion confirm that such is the law in this state. See also *State v. Land Clearance For Redevelopment Auth.*, 364 Mo. 974, 270 S.W.2d 44, 52–53 (banc 1954), and *Annbar Associates v. West Side Redevelop-

*ment Corp.,* 397 S.W.2d 635, 653 (Mo. banc 1966).

It is suggested by a very logical argument that resolution of this state issue disposes of the case, and that no church-state question is actually involved. The theory being that the grants made lose their identity as public funds when the students commingle the same with required other funds to obtain a college education, i. e., the "public purpose" is then served. However, in view of the breadth of the trial court's ruling we do not consider it appropriate to act on the suggestion.

Second, we return to the so-called religious aspects of the case.

■ Challengers herein emphasize that the constitution of Missouri, as construed by this court, is more "restrictive" than the First Amendment to the United States Constitution in prohibiting expenditures of public funds in a manner tending to erode an absolute separation of church and state. *Luetkemeyer et al. v. Kaufmann et al.,* 364 F.Supp. 376 (W.D.Mo.1973), affirmed, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974). Comparable declarations, with the rationale thereof, may be found in *Harfst v. Hoegen,* 349 Mo. 808, 163 S.W.2d 609 (banc 1942); *Berghorn v. Reorganized School District No. 8, Franklin County, Missouri,* 364 Mo. 121, 260 S.W.2d 573 (Mo.1953); and more recently in *Paster v. Tussey,* 512 S.W.2d 97 (Mo. banc 1974), cert. den., 419 U.S. 1111, 95 S.Ct. 785, 42 L.Ed.2d 807 (1975). The validity of such holdings becomes apparent after even a cursory reading of those portions of the constitution of this state heretofore quoted.

■ Since we are here concerned with a college related program, Art. IX, § 8, is of particular interest, because it proscribes "an appropriation . . . from any public fund . . . to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever . . . ." Challengers of the plan submit that the section does not distinguish between various educational levels and thereby prohibits adoption of a different standard for schools of higher education from that applied to elementary-secondary schools. With this we agree. Nevertheless, there does remain a question as to whether or not the factual situation now presented is comparable to that found in the *Harfst, Berghorn* and *Paster* cases, supra. Proponents of the program submit that it is not and seek to distinguish the same. We quote a portion of the argument made, to-wit: ". . . the Missouri Financial Assistance Program deals with aid to needy students seeking higher education * * * The Program provides assistance to adults whose parents no longer have any legal obligation to provide them with an education, rather than to immature children who are fully dependent on their parents for financial, educational and spiritual guidance and support * * * The language of the Act is clear and explicit in providing that the Program is designed and implemented for the benefit of the students, not of the institutions, and that the awards are made to the students, not to the institutions * * * The legislative purpose in no wise includes supporting aiding or sustaining either public or private educational institutions * * * Permeating the Act is the concept that awards made pursuant to the Program are to be made only to a 'qualified applicant,' i.e., a 'student,' an 'individual' enrolled in an approved public or private institution . . . based on 'his' financial need, not on the need of the public or private institution which the student elects to attend." The argument is not without some merit, because it is a matter of common knowledge that there is a factual distinction between the availability of educational opportunities at the college level and that at the elementary-secondary. The latter is provided and supported by tax monies free to all who attend; and, as was concluded in the *Paster* case, expenditures for those who reject the free education offered in the public schools and attend a private school (for reasons of their own) are constitutionally prohibited. As said therein, l. c. 105: "Although parents who send their chil-

dren to private schools bear the burden of supporting such institutions, as well as the public schools, the additional burden is self-imposed. That such a sacrifice has been made by so many through the years makes it self-evident that individuals, as such, do act and live with a sectarian purpose in the area of education—an objective which the people of Missouri, speaking through their constitution, have protected fully but also have declared to be one personal to the individual."

In contrast, the state does not provide a free college education and we believe that attendance at other than public institutions at that level does not have the same religious implications or significance as was found in the *Paster* case. The constitutional restriction is only that the institution not be " . . . controlled by any religious creed, church or sectarian demonimation . . ." and the statutory provisions in question appear to dictate as much. § 173.-205(2)(a) requires that an "approved" school must have an "independent board." Thus, those schools statutorily qualified would not be subjected to that "control" prohibited by Article IX, § 8, of the Missouri Constitution. Furthermore, the qualifications include approval by accrediting groups which condition approval on academic freedom. 173.-205(2)(c).

It is argued, additionally, by those defending the program that tuition and fee payments made by a student do not represent grants "in aid of" or "help to support or sustain" an institution. It is submitted that such payments: " . . . were not gifts or donations by the students to the institutions, but were the *quid pro quo* in return for which the institutions were contractually required to make available the opportunities for the students to obtain a college education * * * No institution made a 'profit' on the tuition fees received, whether paid in part by a recipient of an award from the Missouri program, from some Federal program, or by the student out of his own pocket. All qualified institutions are not-for-profit organizations, and the record shows that the cost to each insti-

tution of furnishing to its students their educational opportunities is always far greater than the amount of the tuition received." In essence, the argument presents the practical suggestion that upon the enrollment of a student the selected institution, be it public or private, must find additional funds (over and above the tuition or mandatory fee), and that it is at least debatable whether or not encouraging the creation of such additional obligations is constitutionally proscribed for the reason it is in "aid" of an institution. Reference is made to *Kintzele v. City of St. Louis,* 347 S.W.2d 695 (Mo. banc 1961), involving sale of land by the St. Louis Land Clearance for Redevelopment Authority to St. Louis University, wherein this court approved with the view the sale was an "exchange of considerations" and thus not aid to a religious corporation.

In answer to the second part of the federal test (heretofore reserved), we are convinced that the statutory program does have a *primary* effect other than the *advancement* of religion.

Furthermore, we can not with confidence declare that the statutory program "clearly and undoubtedly contravenes" the Constitution of Missouri (*State ex rel. Eagleton v. McQueen,* supra); that it is "plainly and palpably a violation of fundamental law" of this state (*Borden Company v. Thomason,* supra); nor that it unquestionably "run[s] afoul of some constitutional prohibition" (*State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority,* supra). Such being true, the program should be recognized as embodying the will of the people and not constitutionally objectionable. Judicial deference is not indicative of the avoidance of a duty but to the contrary is the performance thereof with an appreciation that judicial interference with the legislative process should occur only when there is an unavoidable and legally compelling reason to do so. "[I]t is our duty to resolve all doubts in favor of the validity of a legislative act . . ." *State ex rel. McClelland v. Godfrey,* 519 S.W.2d 4, 8 (Mo.

banc 1975). In doing so, we take solace in the fact that the parochial school cases with which this court has dealt in the past involved completely different types of educational entities than the colleges and universities herein involved. As suggested by the proponents: "Institutions of higher education are able to boast of academic freedom, institutional independence, objective instruction, lack of indoctrination, faculty autonomy, mature students and a diversity of religious background in faculty and students."

Challengers of the program have not contended that the legislative finding embodied in § 173.200 was induced by fraud, collusion or bad faith, but we should comment on the subtle suggestion that approval here will open the gates to further efforts to breach the constitutional "wall" between the state and the church. Although finding the "wall" is perplexing, it is not for the courts to shy so far from the same as to do a disservice to those whose interests fall on one side or the other. We have decided this case on its merits under long established rules of statutory construction and will be available when and if further questions arise.

■ Lastly, there is a procedural problem. The prayer of plaintiffs' petition sought only a finding that the statutes involved were "facially" unconstitutional, and the judgment of the trial court is so limited. However, much of the record before this court and most of the arguments revolve around answers to interrogatories, stipulations, corporate by-laws and school catalogs of the individual institutions presumably that this court might determine which, if any, of the schools do not meet the "qualifications" set out in the statute. We do not think it appropriate for an appellate court to do so in the first instance; although the attack is directed actually at only 17 of the 51 institutions and arguably just 4. Nor is remand called for because the trial court

did act on the prayer presented. Administration of the Act by the Board will be a continuing process in light of changing conditions and an approaching new school year. Nothing done here will prohibit challenges that the Act is being implemented in an unconstitutional manner.

The judgment is reversed.

HOLMAN and FINCH, JJ., concur.

BARDGETT, J., concurs in separate concurring opinion filed.

SEILER, C. J., and HENLEY and DONNELLY, JJ., dissent in separate dissenting opinions filed.

BARDGETT, Judge (concurring).

In view of the dissent[1] of Seiler, C. J., I deem it advisable to briefly state my views on the major portion of that dissent.

Just about four weeks ago this court upheld the constitutionality of the Missouri Campaign Finance and Disclosure Law in *Chamberlin et al. v. Missouri Elections Commission et al.,* (59505 Mo. banc 6/21/76). In that case this court, quoting from *State ex rel. State Highway Commission v. Paul et al.,* 368 S.W.2d 419, 422 (Mo. banc 1963), held:

"It is a cardinal rule of statutory construction that where a statute is fairly susceptible of a construction in harmony with the Constitution it must be given that construction by the courts and, unless the statute is clearly repugnant to the organic law, its constitutionality must be upheld. *City of Joplin v. Industrial Commission of Missouri,* Mo., 329 S.W.2d 687, 692[6]; *Brown v. Morris,* 365 Mo. 946, 290 S.W.2d 160, 167[8]; *State on inf. Dalton v. Metropolitan St. Louis Sewer Dist.,* 365 Mo. 1, 275 S.W.2d 225, 234[23]; *State ex inf. McKittrick v. American Colony Ins. Co.,* 336 Mo. 406, 80 S.W.2d 876, 882–883[5]; *State ex rel. Barrett v. May,* 290 Mo. 302, 235 S.W. 124, 126[3].

1. I refrain from commenting on the quotation appearing in the dissent of Seiler, C. J., from *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946), because it is

taken from the *dissenting* opinion of Jackson, J., and is not the law of that case and is not representative of the United States Supreme Court's disposition of the matter.

"Courts will not ordinarily pass on constitutional questions where the case presented may be properly decided without doing so. *McIntosh v. Connecticut General Life Ins. Co.*, Mo., 366 S.W.2d 409, 412[2]; *City of St. Joseph v. Roller,* Mo., 363 S.W.2d 609, 612[6]; *Rider v. Julian,* 365 Mo. 313, 282 S.W.2d 484, 497[23]."

The court said that the two subsections under attack in *Chamberlin* were fairly susceptible of a construction that will obviate any need to reach and decide the Fourteenth Amendment question (equal protection) decided by the trial court. The court then construed the two subsections, which facially were in conflict, so as to cause the ambiguous or conflicting subsections to be applied equally and therefore constitutionally. In so doing this court brought the subsections within the constitutional requirement.

The legislature is deemed to be aware of the inhibitions imposed by the constitution and therefore if statutory language is susceptible to two constructions, one constitutional and the other unconstitutional, it should be construed in a manner consistent with the provisions of the constitution. *City of Kirkwood v. Allen,* 399 S.W.2d 30 (Mo. banc 1966); *The Vessel "Abby Dodge" v. United States,* 223 U.S. 166, 175, 32 S.Ct. 310, 56 L.Ed. 390 (1912).

In the instant case there is no provision in the statute under attack which directs or authorizes the use by a school of the award money for sectarian religious purposes. To the contrary, it appears that the proscription against the use of such funds for a course of study leading to a degree of theology or divinity clearly evidences a legislative intent that the money not be used for sectarian religious purposes. The coordinating board for higher education is the administrative agency charged with implementation of the program established by sections 173.200–173.235 and is vested with the power to "promulgate reasonable rules and regulations for the exercise of its functions and the effectuation of the purposes of sections 173.200 to 173.235." Sec. 173.-210, RSMo Supp.1975. It is clear from the "purpose" section of the act (sec. 173.200) and the other provisions of the act that it was not the intent of the legislature to provide money for sectarian religious purposes.

Such a construction of the instant statute by this court comports with the rules of construction articulated and applied in *Chamberlin, supra,* and *City of Kirkwood v. Allen, supra,* and would be consistent with this court's duty to construe legislative enactments so as to uphold their constitutionality when possible rather than to strike down a legislative act because of an alleged omission when the constitutions of the United States and Missouri fill in that alleged omission and provide the perimeter within which the law can constitutionally operate.

Under the act the coordinating board has the obligation to promulgate regulations so as to insure that the funds are not used for sectarian religious purposes in conformity with the provisions of the constitutions of the United States and the State of Missouri.

The foregoing is set forth because of the dissenting opinion of SEILER, C. J., although it is quite clear under the majority opinion of MORGAN, J., that the coordinating board has the obligation to administer the act in a constitutional manner and therefore to take such steps as necessary to insure that the funds not be used for sectarian religious purposes.

SEILER, Chief Justice (dissenting).

The majority opinion has it both ways: it finds no violation of Art. III, Sec. 38(a), which forbids granting public money to any private person, saying that the statutory program has a public purpose and hence the people of the state are the direct beneficiaries of the expenditures. It finds no violation of Art. IX, Sec. 8, which prohibits use of public funds in aid of any religion or sectarian purpose or to help sustain any college controlled by any church or sectarian denomination, on the basis that the aid is to the student, not the school. I do not see how the granting of $900 of public funds to a student can be treated as a grant to the

people of the state so as to avoid being a grant to a private person and also at the same be treated as a direct grant to the student so as to avoid being an appropriation in aid of any religious creed, church or sectarian purpose of a private college.

In addition, I believe the statute violates the Missouri constitutional provisions calling for strict separation of church and state, which are more explicit and restrictive than those of the First Amendment to the federal constitution. *Paster v. Tussey,* 512 S.W.2d 97 (Mo. banc 1974). The statutory scheme contains no limitation that the college where the student uses his grant to pay the tuition be not sectarian. There is nothing which insures that the public funds which are made available will not be used, either directly or indirectly, in aid of a denomination of religion or in aid of a sectarian purpose if that happens to be the type of college which the student selects. All the requirements of the present statute can be met and yet the public funds made available can be used for the forbidden purposes.

Our constitution forbids use of public funds in aid of any sectarian purpose or to support or sustain any college controlled by any sectarian denomination whatever, Art. IX, Sec. 8. No public money shall, directly or indirectly, be put to aid any sect, Art. I, Sec. 7. ". . . The constitutional policy of our State has decreed the absolute separation of church and state, not only in governmental matters, but in educational ones as well. Public money, coming from taxpayers of every denomination, may not be used for the help of any religious sect in education or otherwise. . . ." *Harfst et al. v. Hoegen et al.,* 349 Mo. 808, 163 S.W.2d 609, 614 (banc 1942).

I do not believe the legislature can constitutionally adopt a statute authorizing the granting of public funds to private persons to use for tuition or other school purposes without at the same time incorporating in the statute safeguards against the funds being used, directly or indirectly, to support a sectarian institution. I do not believe the legislature can leave this unprovided for, as has been attempted here.

This is not what was done in Maryland, in its statute providing for grants to private colleges which was upheld in *Roemer v. Board of Public Works of Maryland,* —— U.S. ——, 96 S.Ct. 2337, 49 L.Ed.2d 179, decided June 21, 1976 and on which the majority opinion places heavy reliance. In the Maryland statute, it was expressly provided that "None of the moneys payable under this substitute shall be utilized by the institutions for sectarian purposes." The Maryland Council for Higher Education, which is the counterpart of our Coordinating Board for Higher Education, requires that eligible institutions not put the funds to any sectarian use. The institution must affirmatively declare that the funds will not be used for sectarian purposes and must set forth the specific nonsectarian uses that are planned. At the end of the year the institution must confirm the nonsectarian use of the funds. It must keep the funds in a special account and must retain for verification by the Council sufficient documentation to verify that the funds were not used for sectarian purposes. In the statute which the Supreme Court held in the *Roemer* case did not violate the federal constitution, the Maryland legislature carefully, even meticulously, saw to it that state funds would not be used for sectarian purposes. There is a glaring absence of any such restrictions in the Missouri statute and that is why it is unconstitutional on its face: as presently drawn, it permits the use of public funds for sectarian purposes, either directly or indirectly.

The statute states its purpose is to enable qualified full-time students to receive non-religious educational services in a public or private institution of higher education of their choice, Sec. 173.200. But a sectarian institution can and does provide nonreligious educational services, such as courses in mathematics, physics, languages, geography, music, history and the like. It does not follow that because a student receives non-religious educational services that the col-

lege where he receives them is not a sectarian institution.

The statute also requires that to be considered an "approved private institution", the college, among other things, must be operated "under the control of an independent board". Sec. 173.205(2)(a). But this does not mean that the college is not sectarian. It might have a fiercely independent board which nevertheless is determined to and does operate a sectarian institution. In the case at bar, Southwest Baptist College and William Jewell College are examples of colleges whose boards of trustees have firm and independent convictions that their colleges are and will continue to be sectarian. These two institutions, on their own initiative, addressed communications in writing to the trial court, making it known that it was incorrect to refer to them as nonsectarian. Both sides in this case have addressed portions of their briefs to these declarations. Both colleges made it quite plain that they have a mission of Christian education in American higher education—that the Christian commitment is their dominant characteristic. The boards of these two colleges each consist of twenty-four trustees, selected by the Baptist Convention. There is no doubt that these boards are independent, in the sense of voting their own convictions and not being subordinate or subject to the control of others in the operation of the college, but it is equally clear that they are determined to operate a sectarian institution with a commitment to follow the Christian doctrine as seen by the Baptists. It may not take, but in these two colleges, they are not leaving the student "to pick up religion by chance". There is nothing wrong about this, of course, but it cannot be supported or aided by public funds under our constitution, and yet so far as the statute is concerned these institutions are eligible for approval.

The statute prohibits any grant to a student who is enrolled in a course of study leading to a degree of theology or divinity. Sec. 173.215.1(6). This, however, provides no assurance that the college being helped is not sectarian. It could be sectarian and not offend this part of the statute so long as the student receiving aid to go to the college did not take a course of study leading to a degree in theology.

The statute also provides that an approved institution must meet the standards for accreditation as set by the North Central Association of Colleges and Secondary Schools, that it must operate in compliance with the Civil Rights Act of 1964 and not discriminate as to students, faculty, staff or administration on the basis of race, color, religion, sex or national origin, and must permit faculty members to select textbooks without influence or pressure from any source. Sec. 173.205(3)(d), (e), and (f). None of these mean that the school is free from sectarianism. It could be in full compliance with the foregoing requirements and still be sectarian in its teachings, character, atmosphere, and operation.

Without undertaking to set forth in lengthy detail the specific examples of sectarianism which are present in their operation as institutions of higher learning, the same goes for fifteen others of the private colleges before us, eight of which have an admittedly close relationship with various Protestant denominations and seven with the Catholic church.

The majority opinion says that if this is true, then the way to get at it is by challenging that the statute is being carried out in an unconstitutional fashion; that this is "purely a statutory question and not one involving resolution of constitutional issues." But this argument assumes that we have a statute which forbids use of the public funds for sectarian purposes, directly or indirectly. However, as pointed out, we do not. The Board could very well say it finds nothing in the statute prohibiting use for sectarian purposes and that it is no part of its duty to make any such inquiries of the college or the student.

In sum, the tests or guides contained in the statute do not meet the real issue.

Finally, in my opinion, it is not even arguable that giving a grant to a student is not a form of public aid to the college. Beyond question, the student is going to use

the grant to help pay his college expenses, including tuition. This, in effect, is what the statute says is expected. Tuition is part of the lifeblood of a private college and anything that helps the student pay tuition helps the college to that extent and frees money for the college to use for other purposes. In the case before us, the student is merely the conduit of the grant through whom the state aid is transmitted to the school.

The majority opinion recognizes this indirect aid effect to the school, but quotes from the *Roemer* decision about its being permissible for a church to be protected by the police and fire departments or to have its public sidewalk kept in repair. But, respectfully submitted, this argument by analogy does not fit the present case. In the first place, the constitutional prohibitions against mingling of church and state contained in the Missouri constitution are much stronger than those contained in the First Amendment, as we have often held, *Paster v. Tussey,* supra. Our constitution prohibits aid, either *"directly or indirectly"*, Art. I, Sec. 7 (emphasis added). There is no such provision in the First Amendment.

Second, as Mr. Justice Jackson wrote in disposing of a similar argument in *Everson v. Board of Education,* 330 U.S. 1, 25–26, 67 S.Ct. 504, 516, 91 L.Ed. 711: ". . . A policeman protects a Catholic, of course— but not because he is a Catholic; it is because he is a man and a member of our society. The fireman protects the Church school—but not because it is a Church school; it is because it is property, part of the assets of our society. Neither the fireman nor the policeman has to ask before he renders aid 'Is this man or building identified with the Catholic Church?' . . . To consider the converse of the Court's reasoning will best disclose its fallacy. That there is no parallel between police and fire protection and this plan of reimbursement is apparent from the incongruity of the limitation of this Act if applied to police and fire service. Could we sustain an Act that said the police shall protect pupils on the way to or from public schools and Cath-

olic schools but not while going to and coming from other schools, and firemen shall extinguish a blaze in public or Catholic school buildings but shall not put out a blaze in Protestant Church schools or private schools operated for profit? That is the true analogy to the case we have before us and I should think it pretty plain that such a scheme would not be valid."

The sidewalk in front of the church is kept in repair, or the fire extinguished, or the call for police protection answered, not because doing so is a form of aid to the church, but because doing so is in each instance a part of providing such protection for the community as a whole. It does not constitute any justification for arguing that indirect aid to sectarian schools by way of grant of public funds to needy students is thereby made constitutional.

In my opinion, Secs. 173.200–235 are unconstitutional on their face as violating Art. I, Sections 6 and 7 and Art. IX, Sec. 8 of the 1945 Constitution, and I therefore respectfully dissent. I would affirm the judgment of the trial court.

HENLEY, Judge (dissenting).

Because the principal opinion approves an appropriation of money to assist young people in acquiring a college education, a worthy purpose with strong appeal to all of us, it would be easier to concur than to dissent and thereby hold the line drawn by the people in their constitution.

Section 38(a) of Article III, Constitution of Missouri, provides:

"The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any *private* person, association or corporation, *excepting aid in public calamity, and general laws providing for pensions for the blind, for old age assistance, for aid to dependent or crippled children or the blind, for direct relief, for adjusted compensation, bonus or rehabilitation for discharged members of the armed services of the United States who were bona fide residents of this state during their service, and for the rehabili-*

*tation of other persons. * * * "* (Emphasis added.)

Despite this command of the constitution, the principal opinion has approved a grant of public money to private persons, needy college students. It does so on the basis that the money appropriated is for the use of these persons in acquiring a higher education, said to be a purpose which the general assembly may, in its legislative discretion, determine to be a "public" purpose. The answer to this is that the people have, by the "exception" clause in § 38(a), determined for themselves and specifically enumerated and limited the purposes for which the general assembly may grant public money to *private* persons.

It is not enough for the principal opinion to declare that aid to needy students is a "public purpose." In my opinion, a grant of public money to private persons may be made only for the "purposes" enumerated in the exception clause of § 38(a). A grant to private persons may not be made for any "purpose" other than those enumerated in the exception clause of § 38(a).

For the reasons stated, I respectfully dissent.

DONNELLY, Judge (dissenting).

Article I, Section 7 of the Constitution of Missouri reads as follows:

"That no money shall ever be taken from the public treasury, directly or *indirectly,* in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship." (Emphasis mine.)

I think it must be conceded that the money paid out under the challenged statutory scheme will result in aid to some denominations of religion. The statutory mode of payment of such money to students, rather than directly to institutions for sectarian purposes, is itself a classic example of *indirect* aid to denominations of religion.

The principal opinion quotes the provisions of Art. I, § 7, *supra.* They are not thereafter mentioned. The principal opinion thus ignores the *indirect* aid proscription in Art. I, § 7, *supra,* and applies to Missouri the less restrictive federal position on separation of church and state as articulated in *Roemer.*

In my opinion, the statutory scheme is facially unconstitutional because it authorizes violations of Art. I, § 7, *supra.*

I respectfully dissent.