MISSOURIANS FOR SEPARATION OF CHURCH AND STATE, a corporation, and James L. Atwell, James T. Blair, Roger D. Briggs, W. Ross Edwards, Junior Jean Osborn, Ruby Reich, James Tatum, and G. Hugh Wamble, Plaintiffs-Appellants,

v.

Bruce ROBERTSON, Commissioner of Higher Education, Virginia G. Young, Chairman, Lela H. Bell, John H. Biggs, Richard J. Blanck, Joe T. Buerkle, Clarence K. Fulton, Jr., F. William McCalpin, H. Lang Rogers, and Eugene M. Strauss, Members, the Coordinating Board for Higher Education,

and

Central Methodist College, Culver-Stockton College, Fontbonne College, Rockhurst College, Southwest Baptist College, Wentworth Military Academy, Westminster College, William Jewell College, William Woods College, Defendants-Respondents.

No. KCD 30164.

Missouri Court of Appeals, Western District.

Dec. 3, 1979.

Motion for Rehearing and/or Transfer Denied Dec. 31, 1979.

Application to Transfer Denied Feb. 11, 1980.

Harry D. Dingman, Kuraner, Dingman, Schwegler, Kinton & Lowe Professional Corp., Kansas City, for plaintiffs-appellants.

John D. Ashcroft, Atty. Gen., J. Paul Allred, Jr., William F. Arnet, Asst. Attys. Gen., Jefferson City, for state officials.

Dick H. Woods, George E. Feldmiller, Mark S. Foster, Kansas City, for S. W. Baptist College.

Michael G. Biggers and T. C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, D. Brook Bartlett, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for other colleges.

Before SHANGLER, P. J., WASSERSTROM, C. J., and CLARK, J.

SHANGLER, Presiding Judge.

The plaintiffs Missourians for Separation of Church and State and G. Hugh Wamble, among other principals, bring suit as taxpayers and as advocates of the separation of church and state for declaratory judgment and injunction against the defendants Robertson as Commissioner of Higher Education, other state officials, and institutional beneficiaries of the Financial Assistance Program [§§ 173.200 to 173.230, Laws 1972, p. 763, §§ 1–7]. The enactment formally declares the purpose of the Program as a means of financial assistance to enable qualified students for *nonreligious instruction in a public or private institution of higher education of choice.* The petition seeks adjudication that the defendants unlawfully administer the Program by practices and failure of rules in a manner contrary to the definition of statute and constitutional principles of separation of church and state, and that the defendants be enjoined from the unlawful conduct.[1]

The petition was challenged by motions to dismiss on grounds (1) that the joinder of the state officials was indispensable to the cause of action so that venue lay properly in Cole County, (2) that the defendant Wentworth Military Academy was without sectarian affiliation and so not affected by the pleading or prayer of the petition, and (3) that as to the remainder defendants the petition challenges a CBHE action in a *contested case* within the Administrative Procedure and Review Act so that any standing for access to a court or jurisdiction for judicial review lapsed to the plaintiffs by failure to file a petition within thirty days

1. The other defendants are the appointed members of the Missouri Coordinating Board for Higher Education [CBHE]—charged by law with administration of the Program according to its purposes [§ 173.210], all sued in official capacity, and Central Methodist College, Culver-Stockton College, Fontbonne College, Rockhurst College, Southwest Baptist College, Wentworth Military Academy, Westminster College, William Jewell College and William Woods College, all "approved private institu-tions" for benefits under the Program, according to the practices of CBHE. The. petition contends as against all the institutional defendants, save Wentworth Military Academy, receipt of public money in contravention of statutory and constitutional standards of the separation of church and state. The petition contends as against Wentworth Military Academy receipt of public money in contravention of statutory and constitutional standards against sex discrimination.

of decision according to the terms of § 536.110, RSMo 1978.[2]

The motions to dismiss were contested by a catalogue of documents submitted to the trial court—affidavits, interrogatories, exchange of correspondence among the principals—and received as evidence.

The court ordered the petition dismissed as to the state officials for want of venue, as to Wentworth Military Academy for failure to allege an interest subject to adjudication, and as to the remainder defendants [save Wentworth which did not join the assertion] for lack of jurisdiction.[3]

■ At the outset, the appeal confronts yet another motion to dismiss, this time on procedural grounds. The several defendants challenge the three volumes of exhibits as an extraneous, prolix and largely irrelevant documentation. They refused to stipulate to that library of documents as an Exhibits Transcript and now contend that, absent agreement, the lodgement of those papers on appeal violates Rule 81.15. The argument misunderstands the sense of that procedure. Rule 81.15 merely provides that the parties *"may stipulate* that all or any part of the original exhibits *may be omitted* from the transcript on appeal and be separately filed in the appellate court."* [Emphasis added.] The terms of Rule 81.15 require enlistment of agreement only to *omit* an exhibit from the transcript, and not to include them all. The contention defendants make would have validity were the Exhibits Transcript a record *separately filed in the appellate court.* The discursive, as well as the exhibits, transcript was disputed. The controversy was submitted under Rule 81.12 to the trial court who, by order, approved "the Transcript on Appeal and the Exhibits Transcript." The formal approval leaves no doubt that the sanction was to a unitary record—the "Transcript on Appeal,

including the Exhibits Transcript referenced [there]in." A party has no need for adversary agreement to file on appeal a complete transcript of the proceedings. In any event, a violation of Rule 81.15—even if shown—incurs a discipline less drastic than peremptory dismissal. Rule 84.04.

■ The defendants contend also that the voluminous documentation of the Exhibits Transcript violates the provision of Rule 84.14 that the transcript shall contain "all the record, recitals, proceedings, and evidence *necessary* to the determination of all questions presented to the appellate court for decision." The defendants advert, once again, to the massiveness of the 568 page array of exhibits to demonstrate the inherent irrelevancy of such an agglutination. The question is not the ponderousness of a transcript, but whether the inclusions are *necessary* to a decision of the issues on appeal. Any controversy as to the necessary relation of one to the other—as well as other compliances with the rules on transcripts—was settled by the approval by the trial court under Rule 81.12. We are bound by that determination. *Lewis v. Hubert,* 532 S.W.2d 860, 867[15] (Mo.App.1976). The defendants seek dismissal of the appeal or, we assume, merely to efface the Exhibits Transcript. An appellate court may order a supplement to the transcript, but—absent accident, inadvertence or mistake—not a deletion. Rule 81.12(c).

The defendants ardently pursue the contention of an irrelevant Exhibits Transcript. That contention lacks diffidence. A motion to dismiss does not self-prove the issue. *Randall v. St. Albans Farms, Inc.,* 345 S.W.2d 220, 223[2] (Mo.1961). When the motion rests on facts not of record, a court may [and did] hear the matter on affidavit. Rule 55.28. The three motions to dismiss ruled by the court for the defendants, as we conclude, entail an entwinement of facts

**2.** Two other motions to dismiss were asserted by the several defendants, one was denied and the other was given no decision. They are not the subject of appeal.

**3.** The preamble to judgment recites the grounds of dismissal as *lack of jurisdiction and*

*standing.* The decree of judgment, however, rests that facet of dismissal *on lack of jurisdiction* only. The contentions of the parties on appeal assume the order rests on the dual grounds.

not inferable from the bare pleadings alone. The questions of venue and the nature of the judicial process open to those in the posture of the plaintiffs, among others, are defined in terms of the remedy the plaintiffs have undertaken to employ—which, in turn, is demonstrated by the interchanges between Wamble and his associates with the CBHE officials. That is the import of many of the exhibits. The defendants understand that their burden to prove the motions required evidence. They even understand that the source for that evidence is the Exhibits Transcript—to which *every* defendant resorts to prove the several motions to dismiss. We need not conclude, but confidently surmise, that absent this proof, the trial court would not have adjudicated the dismissal motions for the defendants.

To be sure, a most casual glance through the Exhibits Transcript discloses much that does not qualify as competent evidence. The defendants, however, do not differentiate but condemn the entire assortment of documents. They do not mean, so we assume, to forgo those upon which the adjudication for dismissal rests, but that is the consequence. The defendants did not accept the rightful initiative the law imposes to demonstrate to the trial court the transcript inclusions not necessary to the determination of the questions on appeal. They have not proved a noncompliance by plaintiffs with Rule 81.14.

■ Another contention for dismissal of appeal cites violation of Rule 84.04. The brief of the plaintiffs does not show fastidious concern for some elementary aspects of appellate advocacy. The rubrics do not announce the points relied on but rather, arguments and authorities; the statement of points even in that guise is less than the "wherein and why" of the trial court error the rule contemplates. The exposition and argument, however, leave no doubt as to the error contended or the reasons why the decision should not stand. The meticulous development of the argument leaves no doubt as to the points on appeal. A respondent cannot be misled by the formal lapses

the defendants cite. They fall far short of those condemned in *Geiler v. Boyer,* 483 S.W.2d 773 (Mo.App.1972) and those other authorities the defendants rely on. It would not subserve justice to strike the brief of the appellants or to dismiss the action on account of those, or other, derelictions the defendants cite.

The motions of the several defendants to dismiss the appeal for failure to comply with the rules of appellate procedure are overruled for the reasons given.

## THE LEGAL MATRIX

The Missouri Financial Assistance Program [§§ 173.200 to 173.230] was established by the Laws of 1972 to enable qualified students to receive money grants for nonreligious instruction in an approved public or private college of choice. § 173.200. The administration of the Program was given to a Coordinating Board for Higher Education [CBHE] with the power to promulgate reasonable rules and regulations for the accomplishment of the statutory purpose. § 173.210. An *approved private institution* within the definition of statute means [§ 173.205(2)]:

[A] nonprofit institution, dedicated to educational purposes, located in Missouri which:

(a) Is operated privately under the control of an independent board and not directly controlled or administered by any public agency or political subdivision;

(b) Provides at least a collegiate level course of instruction for a minimum of two years, leading or directly creditable toward an associate or baccalaureate degree;

(c) Meets the standards for accreditation as determined by the North Central Association of Colleges and Secondary Schools;

(d) *Does not discriminate in the hiring of administrators, faculty and staff or in the admission of students on the basis of race, color, religion, sex or national origin* and is in compliance with the Federal

Civil Rights Acts of 1964 and 1968 and executive orders issued pursuant thereto; [Emphasis added.]

(e) Permits faculty members to select textbooks without influence or pressure by any source.

The constitutionality of the Program enactment was questioned by Wamble and associates on contentions that the scheme infringed the First Amendment to the United States Constitution and the several sections of the Missouri Constitution which prohibit the use of public funds for the advancement of religion.[4]

*Americans United v. Rogers*, 538 S.W.2d 711 (Mo. banc 1976) found that the Program enactment was for a secular purpose and upheld the face of the statute. The sanction rested on the iteration of the relevant constitutional requirements in the statutory definition of *approved institution* [§ 173.-205]. *Rogers* expressly withheld decision as to which of the schools cited—if any at all—failed the statutory qualifications for approval. *Rogers* concluded opinion with [l.c. 722[13]]: "Nothing done here will prohibit challenges that the Act is being implemented in an unconstitutional manner."

On this appeal Wamble and associates challenge that CBHE administers the Program in an unconstitutional manner. The quiddity of the contentions is that each of the defendant institutions was approved by a rule which exempts a college, in particulars, from the religious and gender nondiscrimination prohibitions of § 173.205(2) as they relate to the admission of students and the employment of administrators and faculty under the Program—all in violation of the statute and the constitutional principles the enactment reflects.

## THE FACTUAL MATRIX

■ The Missouri Financial Assistance Program went into effect in year 1972. A list of fifty-five approved institutions was published by CBHE, twenty-nine private and twenty-six public schools, and includes all of the defendant institutions in suit.[5] These defendants have continuously enjoyed approved status since. Immediately after *Rogers*,[6] Wamble commenced inquiry of the CBHE as to the official method used for determination of an *approved institution* under the Program enactment. Thus, on September 1, 1976, Wamble by letter requested the CBHE executive (1) for the form furnished by the agency for completion by an institution in the student financial assistance program to show compliance with § 173.205 of the Program, (2) for guides or instructions given by the CBHE to the institution as aids to the completion of the form, (3) for any regulations promulgated by CBHE to ensure that funds to the institutions under the Program are not used for sectarian religious purposes, and (4) for any form an *approved institution* must execute before expenditure of funds under the Program to certify that the school does not use the funds for a sectarian religious purpose.

Response came within days from Interim Commissioner O'Halloran that he had in-

---

4. That litigation contended that the Program not only violated Article I, §§ 6 and 7, Article IX, § 8 and Article X, § 3 of the Missouri Constitution which prohibits the establishment of a religion by state action or the use of public funds for the advancement of religion but also that the Program violated the prohibition of Article III, § 38(a) against grant of public funds for a private school or a private person.

5. The recitation of facts derives from the petition and the Exhibits Transcript before the trial court. On the motions to dismiss the petition, we assume the facts well pleaded as true by a liberal construction [*Dix v. Motor Market, Inc.,* 540 S.W.2d 927, 929[1] (Mo.App.1976)] and ac-

cept as competent evidence the affidavits of the Exhibits Transcript which stand undenied. *Litzinger v. Pulitzer Publishing Company,* 356 S.W.2d 81, 87[2, 3] (Mo.1962).

6. In *Rogers* the plaintiffs [Wamble among them] asserted that CBHE had unlawfully approved schools [the institutional defendants among them] not qualified under the statute. That assertion, however, was not adjudicated by the Supreme Court because not within the declaratory judgment relief sought by the pleaded cause of action [l.c. 722[13]].

structed Director Stillwagon to furnish the information requested. That day Stillwagon sent Wamble a copy of a form, "Request for Certification of Institutional Eligibility" and a copy of an agency memorandum of November 16, 1972. The Request for Certification was a simple single-page form submitted to each school for a *yes* [or] *no* answer to twenty-five questions concèrning the practice of institutional discrimination as to each subject. The agency memorandum was a statement of administrative policy ·adopted in year 1972 by the CBHE predecessor [Missouri Commission for Higher Education] and retained as the criterion for administration of the Program since. The memorandum, devised by Purdy, the first Director of the Program, informed the presidents of the interested schools:

Nondiscrimination on the basis of race, color, religion, sex or national origin, and protection of civil rights of all individuals in the educational process is expected in employment situations where state and Federal tax dollars are used. *However, there are certain specific exemptions for religious corporations and educational institutions which protect their time-honored rights of governance and prevent the law from dictating in matters of religion.* Note the exemption below as quoted from Higher Education Guidelines, Executive Order 11246, pages H(1) and H(2):

Public Law 92–261, 92nd Congress, H.R. 1746, March 24, 1972, Equal Employment Opportunity Act of 1972, Section 3. Section 702 of the Civil Rights Act of 1964 (78 Stat. 255; 42 U.S.C. 2000e–1) is amended to read as follows: "Section 702. This title shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on

by such corporation, association, educational institution, or society of its activities."

Recent legal emphasis on preventing discrimination against admission of women to certain educational institutions is intended to insure their rights to enter the vocational and professional schools— medicine, law, dentistry, etc. *Note the specific provisions not to dictate admissions policies for private undergraduate colleges and public schools which have traditionally admitted only women. or only men students.*

Public Law 92–318, 92nd Congress S. 659, June 23, 1972, Educational Amendments of 1972, provides for prohibition of sex discrimination. "Section 901(a)(1) in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education."

Since the above specifically omits private institutions of undergraduate higher education, therefore, the law does not apply to them.

"Section 901(a)(5) in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex."

*The Missouri Commission on Higher Education assumes it was the legislative intent that S. 613 be in conformity to the Federal laws and guidelines regarding nondiscrimination and civil rights provisions of Federal law. Therefore, private and public institutions covered by the exemptions stated above would not be in conflict with Sections 2(2)(d) and 2(3)(e) of the Missouri law.* [Emphasis added.]

The memorandum, the other forms and the advices from Director Stillwagon

prompted Wamble to conclude [7] that the agency policy for an *approved institution* rested on premises that the Program enactment required no certification against sectarian or gender-discriminatory use. Wamble made efforts, to no avail, to persuade the administrators that the Purdy memorandum and agency practices undermined the strict religious and gender nondiscrimination standards which § 173.205(2)(d) of the Program enactment imposes upon an approved institution.[8] On September 4, 1976, Wamble wrote to the Chairman of CBHE with "appeal to Section 536.041, RSMo 1969,[9] [to] respectfully request the Coordinating Board to review and, hopefully, to repeal the official action of the predecessor Missouri Commission on Higher Education . . . and . . . the policy set forth in the November 16, 1972, [Purdy] memorandum and form entitled 'Request for Certification of Institutional Eligibility,' and also to begin administering Section 173.205(2)(d) and (3)(e) as written on the *face* of the law." [Emphasis his.] This went without definitive response. Thus, on September 8, 1976, Wamble repeated the request by a registered letter to CBHE to amend or repeal [in essential terminology] the unlawful, unconstitutional and unauthorized policy of administration of the Program under the Purdy memorandum and to promulgate a new policy faithful to the strictures of the statute and the injunction of *Rogers* that the funds not be used for sectarian religious purposes. The response from CBHE informed Wamble that the request for revision of policy was put under consideration and that response would issue in due course.

The decision in *Rogers* prompted the CBHE also to activity. Although the valid-

---

7. Once again, we do not assess the truth of these assertions of affidavit, but delineate them to define the official action upon which Wamble acted, the interest he sought protected, the remedy he and the plaintiffs pursued—all foreclosed by the judgments of dismissal—and the administrative response.

8. Wamble was moved to formally object to the CBHE that the administration of the Program infracted the religious and gender nondiscrimination standards of § 173.205(2)(d) by responses to the "Certification of Institutional Eligibility" form and other documents submitted by the institutional defendants. For instance:

The defendant William Woods College responded that the school was a "women's college."

The defendant Westminister College response indicated that admission was for men only.

The defendant William Jewell advised MCHE, predecessor to CBHE, that the school understood that participation in the program did not "pre-empt the right of the college to consider religion in the employment of faculty, staff, and administration [but if that was a misconception] then the basic right *sine qua non* of the denominational college is violated and William Jewell College cannot certify the eligibility of its students for state aid."

The defendant Southwest Baptist College advised that, although not required by charter or bylaw, "by custom and tradition, for about the past twelve years, full-time faculty and upper echelon administrators have been, and are, Baptist."

The administrative policy for an *approved institution* under the Missouri statutory Program rested on the year 1972 Purdy memorandum which was directed and issued to every institutional applicant for participation in the Program, and which was thereafter cited by the agency as the basis for determination of *approved institution*. As Wamble perceived it, the memorandum misconstrued federal requirements against religious and gender nondiscrimination and by such misapplication, the agency subverted the express prohibitions of § 173.-205(2)(d) against such practices. The defendant institutions acquired *approved* status in year 1973 under the Purdy standards and have enjoyed that status since, even after *Rogers*, despite [Wamble argues] avowed noncompliance with the Missouri statute.

9. That section of the Administrative Procedure and Review Act provides:

*Any person may petition an agency requesting the promulgation, amendment or repeal of any rule.* Any agency receiving such a petition or other request in writing to promulgate, amend or repeal any rule shall forthwith furnish a copy thereof to the committee on administrative rules and to the commissioner of administration, together with the action, if any, taken or contemplated by the agency as a result of such petition or request, and the agency's reasons therefor. [Emphasis added.]

ity of the administration of the Program was not formally before that court, the decision advised [l.c. 722]: "Nothing done here will prohibit challenges that the [Program] is being implemented in an unconstitutional manner." A session of the CBHE Board was convened on October 10, 1976, with Assistant Attorney General Iverson in attendance as adviser, to reconsider the criteria for determination of an *approved institution* under the Program enactment. At this meeting the Board undertook to review—without pretense of hearing—the *continued participation of the seventeen private colleges* [most of these defendants among them] challenged for eligibility in *Rogers,* but not resolved. Iverson advised compliance with the express statutory language in Board approval of institutions for participation in the Program.[10] Eight schools were approved and the nine others were given opportunity "to present further evidence at an independent hearing" scheduled for November 7, 1976, in Kirksville. The nine were informed by letter of the pendency of the hearing—among them, the defendants Central Methodist College, Fontbonne College, Rockhurst College, Southwest Baptist College and William Jewell College.

The hearing at Kirksville was conducted as an ostensible *contested case* within the Administrative Procedure and Review Act [Chapter 536]. This method appears to have been adopted by the concurrence of official advice to the Board and that of counsel to the institutional defendants on the premise that "the rights of individuals and institutions [might] be brought into question." There was no concern shown that the approval of four defendant schools

on the previous October was not by the same process. The schools were summoned to that meeting by letter, but none issued to Wamble or the other plaintiffs. There was brief testimony at that November hearing, almost all directed at the requirement of § 173.205(2)(a) that the *approved institution* operate privately under the control of the independent board. The Board approved the defendants Central Methodist, Southwest Baptist, Fontbonne, Rockhurst and William Jewell and directed an order to that effect. A formal entry of findings, conclusions and decision, from all that appears, has not issued.

## THE JUDGMENT

The judgment to dismiss the plaintiffs for want of venue in Jackson County and also for failure to pursue a timely judicial review of a contested case poses an internal contradiction. If the petition was from a *contested case* within the definition of the Administrative Procedure and Review Act, then § 536.110.3 [or, more properly, Rule 100.04][11] applies and venue of the petition rests in Jackson County, the residence of plaintiff Edwards. If, however, the cause of action the petition pleads is not from a *contested case,* then the requirement to initiate review within thirty days of agency decision does not apply and jurisdiction is not lost to a court to entertain the petition brought by plaintiffs.

The judgment presents another contradiction. The determination that the plaintiffs are bound as parties to a *contested case* supposes an interest aggrieved by the agency decision.[12] The determination for dismissal that the plaintiffs are without

10. As a matter of parenthesis, there is no indication that the Iverson advisement was accepted. Rather, from what appears, the Purdy memorandum continues as the Board policy for determination of *approved institution.*

11. Rule 100.04 Petition for Review When Filed —Process—Venue:

(a) Petition for Review—When Filed. Proceedings for review may be instituted by fil-

ing a petition in the circuit court or court of common pleas of the county of the plaintiff's residence within thirty days after the mailing or delivery of the notice of the agency's final decision.

12. Rule 100.03 Party Aggrieved Entitled to Judicial Review:

Any person who has exhausted all administrative remedies provided by law and who is

*standing,* on the other hand, supposes they are without any interest the law will protect.

The correctness of the judgment, then, rests on the remedy the petition pleads and the law allows to litigants in such posture.

## THE PLEADINGS OF THE PETITION

The plaintiffs plainly allege "an action for a declaratory judgment and a permanent injunction against the unconstitutional and statutorily-unlawful administration of the Missouri College Student Grant Program or Student Financial Assistance Program as created by Sections 173.200 through 173.230 of the Revised Statutes of Missouri, Supplement of 1975." The plaintiffs allege status to sue as taxpayers of Missouri and as advocates of the free exercise of religion and the constitutional principle of separation of church and state. The petition iterates, then reiterates, the subject matter of suit: to declare that the Program is administered to educational institutions for sectarian religious and gender-discriminatory purposes in violation of the Program and of the constitutional principles that enactment reflects—and to enjoin that unlawful practice.[13] In sum, the petition seeks to redress a policy, and not such a right of property as might accrue to a student beneficiary or to an educational institution under the Program enactment. The plaintiffs do not claim an agency decision was made on insufficient evidence or other such error, but that the administrative practice which determines an *approved institution* for the grant of public funds is illegal.

The express declarations of the petition are aided by the exhibits affidavits given by plaintiffs to contest the motions to dismiss [which become part of the pleading of the petition "for all purposes," Rule 55.-12] and are properly consulted to define the intendment of the pleading. *Commonwealth Insurance Agency, Inc. v. Arnold,* 389 S.W.2d 803, 806[1, 2] (Mo.1965). In full consideration, the plenary petition claims that the administrative practice to dispense the public funds is illegal because the *agency rule* or *policy* on which the practice rests is illegal. There can be no doubt that the year 1972 Purdy memorandum was the agency expression of criteria by which an *approved institution* was determined by CBHE for participation in the Program.[14] It was this memorandum which was distributed to the president of each college to define the conditions of participation in the Program, and it was to this memorandum the president responded for that purpose.[15]

There is no question that the Program enactment constitutes the CBHE as an administrative agency to give effect to the legislative purpose by the promulgation of reasonable rules and regulations. § 173.-210; Rule 100.01(1). Nor is there question that the Purdy memorandum is a *rule* within the definition of Rule 100.01(2) and counterpart § 536.010(4).[16] The overtures by Wamble after Rogers to induce the CBHE to repeal "the official action and police [in the Purdy memorandum]" was understood by the commission chair, Ms. Young, to be a request for changes in "*policy* respecting the administration of Sections 173.200

aggrieved by a final decision in a contested case . . . shall be entitled to judicial review thereof . . ..

**13.** This purpose of suit is stated, stressed and recapitulated at ¶¶ 12, 13, 14, 17, 22, 24, 27 and the prayer of the petition.

**14.** Purdy became in year 1972 the first Director of the Program for MCHE, predecessor to CBHE.

**15.** For instance, the December 11, 1972, letter from President Sells of Southwest Baptist College to Purdy and the April 5, 1973, letter on

the same subject from President Field of William Jewell College to Commissioner Cross of the then MCHE.

**16.** Rule 100.01(2): " 'Agency Rule' includes every regulation, standard, or *statement of policy* or interpretation of general application and future effect, including the amendment or repeal thereof, adopted by an agency, whether with or without prior hearing, *to implement or make specific the law enforced or administered by it or to govern its organization or procedure* . . .." [Emphasis added.]

through 173.235 [173.230]." [Emphasis added.] And, in fact, Wamble explained his initiative as a written "appeal to Section 536.040 [536.041]"—which accords to *any person right to petition an agency* to request the promulgation, amendment or repeal of any rule.[17] The petition by the plaintiffs, as these proofs by affidavit show, merely extends the unavailing overture taken in the first instance to the agency [under § 536.041] to undo its unlawful policy for the grant of public funds[18] to a judicial forum by declaratory judgment [under Rule 87.02(c) and § 536.050].

■■■ The petition of the plaintiffs, therefore, implicitly engages the power of a court to render declaratory judgment on the validity of a rule or the threatened application of a rule under Rule 87.02(c) and § 536.050.1:[19]

The power of the courts of this state to render declaratory judgments shall extend to declaratory judgments respecting the validity of rules, or of threatened applications thereof, and such suits may be maintained against agencies *whether or not the plaintiff has first requested the agency to pass upon the question present-*

*ed.*[20] *The venue of such suits against agencies shall, at the option of the plaintiff, be in the circuit court of Cole County, or in the county of the plaintiff's residence . . ..* [Emphasis added.]

This statute expressly allows a plaintiff the special venue in the county of residence and so, contrary to judgment of dismissal, the action was properly brought in Jackson County. And this statute, contrary to contention, by the very terms does not require that a plaintiff resort first to the agency for relief. The nonexhaustion rationale rests on the distinction between a *decision* and a *rule* [see, § 536.010(3) and (4)]: a *decision* engages the agency expertise on specific facts [*American Federation of Government Emp. v. Acree*, 155 U.S.App. D.C. 20, 23, 475 F.2d 1289, 1292[3–5] (D.C. App.1973)] whereas a *rule* declares in advance of facts whether, for instance, an agency criterion or policy of general application conforms to the standard prescribed in the delegatory statute—in this case, § 173.205. *Missourians For Honest Elections v. Mo. Elections*, 536 S.W.2d 766, 771[1–3] (Mo.App. banc 1976). The plaintiffs by their petition do not impugn the awards of eligibility to the defendant insti-

17. Shewmaker comments on that statute [predecessor to current § 536.041]:

"This is a recognition of the interest of the *general public* in the rules made by agencies. No agency can claim that the exercise of its rule-making power is entirely its own affair." Procedure Before, and Review of Decisions of, Missouri Administrative Agencies, 37 V.A.M.S. 145, 165 (1953). [Emphasis added.]

18. Other than for letters of acknowledgment, the CBHE appears not to have furnished a copy of the formal Wamble request for repeal of the rule to the Committee on Administrative Rules [constituted by § 536.037 for periodic review of agency rules] and the *Commissioner of Administration*, or to have taken any of the further actions contemplated by § 536.041.

19. Subsection 2 of § 536.050 became effective in August, 1978, and so does not bear on this proceeding which ended in judgment in 1977. That enactment provides for complaint by "any interested person" to the Administrative Hearing Commission for determination of the "validity or applicability of any rule, regulation, resolution, announced policy, applied policy, or

any similar official or unofficial interpretation or implementation of state agency authority, other than in a contested case or in a law enforcement proceeding." That statute establishes yet another procedure at the administrative level in addition to that under § 536.041 directly to the agency, and comparable to subsection 1 of § 536.050, at the judicial level. These provisions emphasize the public interest in the determination *in advance* of the validity of agency rule or policy. Shewmaker, supra, 37 V.A.M.S., l.c. 165 (1953); Comment, Federal and Missouri Administrative Procedure Acts: A Comparison, 17 Mo.L.Rev. 286, 311 et seq. (1952).

20. Rule 87.02(c) rescripts § 536.050.1 and concludes at that point of excerpt. The remainder of the excerpt—which establishes venue—continues the text of § 536.050.1. The Rules of Civil Procedure, as Rule 51.01 [and commentary to predecessor Rule 51.01] make clear, do not undertake to extend or limit the provisions for venue established by statute.

tutions for participation in the Program for want of any factual proof—although the invalidity would result despite all proof—but because official rule and policy [the Purdy memorandum] exempts *approved institutions* from the religion and gender non-discrimination imperatives of § 173.-205(2)(d). In fact, the petition seeks no affirmative relief against the institutional defendants, but only against the administrative body. The institutions are defendants only *pro forma*, to declare the full effect of the reputedly illegal rule.[21]

■■ The petition of the plaintiffs, however, seeks not only declaratory judgment of the rule illegality but injunction to prevent the continued illegal practice under the rule. Section 536.050, which empowers a court to render declaratory judgment on the validity of an agency rule, merely supplements the Declaratory Judgment Act [§§ 527.010 to 527.140] and extends the full effect of that remedy to actions against the agency. That much becomes apparent from the promulgation of Administrative Procedure and Review Act § 536.050 as Rule 87.02(c) on Declaratory Judgments. On a petition for declaratory judgment a court is not restricted to a declaration of rights only but may also administer affirmative or coercive relief. *Pollard v. Swenson*, 411 S.W.2d 837, 842[15] (Mo.App.1967). The traditional use of declaratory judgments in administrative law, as we have noted, is for adjudication *in advance* of application the validity of the agency rule or policy. So employed, the remedy supersedes injunction. [See, Law Review Commentaries to § 527.010 of the Declaratory Judgments Act, 35 V.A.M.S. p. 654]. When the agency has *already acted* upon a rule challenged as illegal, the coercive as well as the declaratory aspect of judgment becomes appropriate to prevent the effect of the illegality. The cumulative prayers for declaration of rule illegality and injunction to prevent a continued unlawful administration under the rule were properly before the court by petition under § 536.050 and Rule 87.02(c). Borchard, Declaratory Judgments, pp. 432 et seq. (2d ed. 1941). Venue of the action under the statute was properly in Jackson County at the option of the resident plaintiff Edwards.

### PLAINTIFFS' INTEREST AND STATUS TO SUE

Neither the rule nor the statute, however, prescribes the interest a litigant must show to challenge the validity of an agency rule or policy. It follows logically that the interest which allows a plaintiff to maintain an action for declaratory judgment that a statute unlawfully dispenses public funds and is invalid also allows a plaintiff to maintain a declaratory judgment that an agency rule unlawfully dispenses public funds and so is invalid.

■ The plaintiffs allege status and interest to sue as taxpayers. The defendants contend that the status of taxpayer, merely, alleges an interest common to the populace and not that concrete injury indispensible to a justiciable controversy. They disparage the petition as a "religious ideological quibble," a theoretical grievance not subject to judicial redress. To be sure, to invoke the declaratory judgment remedy, there must be at stake an interest the law will protect. *Wellston Fire Protection Dist. v. State Bank & T. Co.*, 282 S.W.2d 171, 177[12, 13] (Mo.App.1955). The jurisprudence of Missouri establishes that a taxpayer who alleges that public funds are expended for an illegal purpose describes a private injury sufficient to maintain a declaratory judgment and injunction against the illicit action. *Berghorn v. Reorganized School District No. 8*, 364 Mo. 121, 260

---

21. Nor does the Program enactment provide for an inherent procedure to determine the validity of an agency rule or policy so as to preclude access to a court for declaratory judgment under this section in the first instance.

See, *Union Electric Company v. Clark*, 511 S.W.2d 822, 824[1–3] (Mo.1974); *State ex rel. Southwestern Bell Telephone Company v. Public Service Commission*, 592 S.W.2d 184 (Mo. App.1979).

S.W.2d 573, 581[9–11] (1953). The contentions of the defendants misuse *Berghorn* to mean that a direct pecuniary interest *more* than mere taxpayer *only* will support a plaintiff to adjudicate the legality of the outlay of public funds.

■ The taxpayer suit to enjoin the illegal expenditure of public money derives from the common law and persists without necessary aid of statutory authority. *Everett v. County of Clinton*, 282 S.W.2d 30, 34[1–3] (Mo.1955); *Watson v. Kerr*, 315 Mo. 781, 287 S.W. 337, 340 (banc 1926). A usual instance of the taxpayer suit has been to preserve the First Amendment separation between church and state.[22] It was a First Amendment concern which prompted the United States Supreme Court to accord status to a taxpayer to invoke the federal judicial power on allegations of congressional expenditures of public funds contrary to that constitutional provision. *Flast v. Cohen*, 392 U.S. 83, 105–106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).[23]

The rationale for the status of a taxpayer to sue against the illegal expenditure of public money was laid down in the very first litigation of the kind, *Newmeyer v. Missouri & Mississippi R. R. Company*, 52 Mo. 81 (1873). The action was by taxpayers on behalf of themselves and all other citizens similarly interested to set aside a subscription by the county to the capital stock of a private railroad company and to have the bonds issued in payment cancelled as

void. The defendants there contended, as the defendants here contend, that the action could not be maintained by plaintiffs *qua* taxpayers but that some individual interest distinct from that of the citizenry was necessary for status to sue—and [l.c. 85] "that the ownership of taxable property is not such a peculiarity as to take the case out of the rule." The court responded that the status of taxpayer *alone* invests a special interest against unlawful expenditures of public funds [l.c. 88]: "[T]hat the complainants are tax-payers of the city, and others similarly situated constitute a class *specially damaged* by the alleged unlawful act, in the increase of the burden of taxation upon their property situated in the city. *They have therefore a special interest in the subject matter of the suit, distinct from that of the general public . . .* The people out of the county bear no part of the burden; nor do the people within the county, except the tax-payers, bear any part of it. *It is therefore an injury peculiar to one class of persons, namely the tax-payers of the county . . . .*" [Emphasis added.] In effect, the taxpayer suit was the only means for such an interest to be heard [l.c. 89]—"the only adequate remedy to the injured party for wrongs resulting from unauthorized or illegal acts like those complained of."

The concern in *Newmeyer* that the public interest is served by a citizenry empowered to challenge unlawful governmental expenditure of public funds sustains the suc-

---

22. *Berghorn*, supra; *Harfst v. Hoegen*, 349 Mo. 808, 163 S.W.2d 609 (banc 1942); *McVey v. Hawkins*, 364 Mo. 44, 258 S.W.2d 927 (banc 1953); and, [implicitly] *Rogers*, supra. Each of these actions was by declaratory judgment and [or] injunction.

23. The federal precedents on the status of a taxpayer to maintain such an action, on final analysis, bear only by analogy. Missouri law—as our discussion shows—has from the first allowed such a suit as a matter of common law right. The federal forum became available to a taxpayer only lately since *Flast* in year 1968. [See, 2 Cooper, State Administrative Law, p. 555 (1965)]. Whatever other limitations on the status of a taxpayer to sue were fashioned later

in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) and *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the central doctrine of *Flast* that a taxpayer who pleads that federal funds are spent in violation of the First Amendment stands to sue in a federal court. That "narrow holding seems impregnable and seems destined to become a long-term cornerstone of the law of standing." Davis, Administrative Law Treatise, § 22.09, p. 736 (Supp.1970); Nowak, Rotunda and Young, Constitutional Law, pp. 68–73 (1978); Davis, *Standing: Taxpayers and Others*, 35 U. of Chi. L.Rev., 601 (1968); Boger, *Standing Up For Flast*, 67 Ky.L.J. 147 (1978–79).

cessive decisions on the issue of taxpayer interest and status for suit. "In [taxpayer cases] it is not the damage suffered by each taxpayer or by all taxpayers as a class that opens the door to equity for relief, but it is *the public interests* which are involved in preventing the unlawful expenditure of money raised or to be raised by taxation." [Emphasis added.] *Clark· v. Crown Drug Co.,* 348 Mo. 91, 152 S.W.2d 145, 147[4] (1941). "We are of opinion that, where *public interests* are involved, and public funds are about to be dissipated for an illegal purpose, a single taxpayer may maintain an action for itself, and all other taxpayers in said city, to restrain the illegal actions complained of . . . ." [Emphasis added.] *Civic League v. City of St. Louis,* 223 S.W. 891 (Mo.1920). And so, also, in *Berghorn,* a declaratory judgment action brought to enjoin the illegal disbursement of public funds in violation of the First Amendment [260 S.W.2d l.c. 581[9–11]]: "As such taxpayers, there can be no question as to their right and legal capacity to bring and maintain this action for themselves and on behalf of all others similarly situated to enjoin the unlawful expenditure of public funds. In such case *proof of illegal and unconstitutional expenditure of such public funds is sufficient to show private pecuniary injury . . ."* [Emphasis added.]

The contention of the defendants that a taxpayer action must allege a particular, direct injury therefore misunderstands the fundamental nature of the proceeding—the redress of the public interest. The right of a taxpayer to maintain an action *qua* taxpayer for himself and those with the same interest [74 Am.Jur.2d *Taxpayers' Actions* § 34, p. 244] is:

a privilege recognizable and exercisable only in *a public capacity,* and the result to be accomplished must *be of benefit to the public* within the taxing district. *A taxpayer cannot institute a taxpayer's action for the protection of a purely personal right or the redress of a purely personal grievance in which other taxpayers have no interest.* [Emphasis added.]

Our cases by implicit decision give effect to this statement of principle. The special interest instant to the taxpayer derives from a *class specially damaged* by the unlawful act. *Newmeyer v. Missouri & Mississippi R.R. Co.,* supra, l.c. 86, 88. Thus, "allegation that plaintiffs are resident taxpayers, suing for themselves and all other persons similarly situated, is . . . a precursor of other alleged facts . . . intended to show that they will suffer special injury . . . ." *Castilo v. State Highway Commission,* 312 Mo. 244, 279 S.W. 673, 675[2] (banc 1925). An injury peculiar to the class of taxpayers and not suffered by the entire public, therefore, alleges the special damage for status to sue. And in such case, the precedents repeat, it is the public interest, and not the damage, which opens the door of equity to the taxpayers. *Clark v. Crown Drug Co.,* supra, 152 S.W.2d l.c. 147[4]. This is not to gainsay that a special damage accrues to a taxpayer oppressed by unlawful expenditure of public money,[24] but only that the right to sue stands on the larger principle of public interest. *Hawkins v. City of St. Joseph,* 281 S.W. 420, 421[3–5] (banc 1926); *Clark v. Crown Drug Co.,* supra, 152 S.W.2d l.c. 147[4]; *Newmeyer v. Missouri & Mississippi R.R. Co.,* supra, l.c. 88; *Berghorn v. Reorganized School Dist. No. 8,* supra, 260 S.W.2d l.c. 582.

---

24. The decisions use the analogy of taxpayer equitable ownership of such funds and liability to replenish deficiency from misappropriation to explain the nature of the special injury. *Berghorn v. Reorganized School Dist. No. 8,* supra, 260 S.W.2d l.c. 581[9–11]; *Harris v. Langford,* 277 Mo. 527, 211 S.W. 19, 21[1] (1919); *Castilo v. State Highway Commission,* supra, 279 S.W. l.c. 675[1]; *Stocke v. Edwards,* 295 Mo. 402, 244 S.W. 802, 804[1] (banc 1922);

*Watson v. Kerr,* supra, 287 S.W. l.c. 340[9]; *Everett v. County of Clinton,* supra, l.c. 35[5, 6]; *Collins v. Vernon,* 512 S.W.2d 470, 473[2] (Mo.App.1974). These and the decisions cited in the text of opinion are irrefragable authority that the allegation of illegal expenditure of public funds *implicitly pleads a special injury Missouri law will protect* as a means to enhance the public interest.

The authority cited by the defendants simply does not support the contention that to maintain suit a taxpayer must allege a direct, pecuniary injury different from that to other taxpayers. *Spencer v. Village of DeKalb*, 408 S.W.2d 78 (Mo.1966) and *Moseley v. City of Mountain Grove*, 524 S.W.2d 444 (Mo.App.1975) were actions by taxpayers to restrain the municipality from negotiation of revenue bonds. They were denied status to sue for want of special injury because the bonds were not subject to payment from public funds [*Spencer*, supra, l.c. 80[1]; *Moseley*, supra, l.c. 447[6]] and so allegation of illegal expenditure, without more, did not import an adverse effect on the taxpayer. The plaintiffs in *Collins v. Vernon*, supra, contested the governmental sale of municipal property and were denied simply because the transaction did not involve expenditure of public funds. The dictum as to taxpayer status to sue in *Collins*, supra, [l.c. 474], rather, reaffirms *Castilo v. State Highway Commission*, supra, and the line of Missouri authority that allegation by a taxpayer that public money is unlawfully spent, by that fact shows an interest to sue.

There remains *Absher v. Cooper*, 495 S.W.2d 696 (Mo.App.1973), decided by the Springfield District of the court of appeals, cited by defendants to show want of status of a taxpayer to sue without show of a special pecuniary damage. That case dealt with a taxpayer claim for declaratory judgment that city officials failed to comply with the requirement of statute to publish a semiannual account of receipts and expenditures, but paid out city money notwithstanding. The text of opinion does not suggest that the claim was an *illegal expenditure of public funds, but only a failure of office to render an account of receipts,* *expenditures and indebtedness* according to statute. That the rationale of opinion rests, not on a taxpayer claim for unlawful expenditure of public money, but on a nonfeasance of office becomes evident from the precedents cited for decision. *Waterman v. City of Independence*, 446 S.W.2d 471 (Mo. App.1969) was a taxpayer suit to construe an ordinance for the selection of a city manager. That case decided there was no justiciable controversy for declaratory judgment because the plaintiff, by admission as well as by law, had no legally protectable interest. This, and the other cases cited in *Absher*,[25] shows the preoccupation of that decision was the interest a plaintiff must show to maintain an action for declaratory judgment—*not* the interest of a taxpayer to contend against the illegal expenditure of public funds.

We will not assume—as do the defendants—that the court of appeals rendered opinion in contradiction of a principle of law established in year 1873 by our Supreme Court in *Newmeyer* and accorded precedence and affirmation by every successive appellate decision on that issue— and all without mention. Our surmise is confirmed by the deliberate exclusion from 26 C.J.S. Declaratory Judgments § 118 citation [at p. 699 of the opinion] of the successive phrase: *at least, where the expenditure of funds is not involved.*[26] That is to say, *Absher* does not concern a claim where a taxpayer claims status [in accordance with established Missouri law] to contest an illegal expenditure of public funds. None of the authority cited by the defendants countervails the status of the plaintiffs taxpayers, without show of any other interest, for declaratory judgment of the invalidity of the agency rule for infraction of § 173.-205(2).

**25.** *Wallach v. Schneider's Credit Jewelers*, 243 S.W.2d 125, 128 (Mo.App.1951); *Contracting Plumbers Ass'n v. City of St. Louis*, 249 S.W.2d 502, 504 (Mo.App.1952); *Spencer v. Village of DeKalb*, supra.

**26.** The opinion renders in paraphrase the cited C.J.S. text:

Thus, a taxpayer does not, as such, have the right to maintain an action for a declaratory judgment as to a statute or ordinance where his personal rights are not involved and cannot be affected,

but, as noted, deliberately omits the proximate phrase:

*at least where the expenditure of funds is not involved.* [Emphasis added.]

The defendants by marginal note contend that the corporate plaintiff, Missourians for Separation of Church and State, has no status to sue. That plaintiff pleads a corporate not-for-profit existence "to advocate and defend the principles of religious liberty and separation of church and state as guaranteed by the First Amendment to the United States Constitution and by the Constitution of the State of Missouri." The footnote to the brief cites *Citizens Against Rezoning, Inc. v. St. Louis County*, 563 S.W.2d 172 (Mo.App.1978). The defendants do not say why, on that authority, the corporate purpose for which Missourians was chartered may not serve as an interest the law will protect and adjudicate by declaratory judgment. That subtle question has only lately emerged to prominent judicial attention. Nowack Rotunda and Young, Constitutional Law, supra, p. 83; *Committee For Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). We are unwilling to consider a point suggested so casually and asserted without developed argument. We will not assume the unaided burden of such an exploration.

#### THE CONTESTED CASE ISSUE

The enactment constitutes CBHE as the agency to administer the Program for financial assistance to a student for nonreligious education in an approved institution of choice. §§ 173.210 and 173.215. To give effect to the legislative purpose, the enactment expressly delegates to CBHE authority to promulgate rules and to determine financial need and qualification of a student for the grant of tuition [§ 173.215] and the status of approved institution [§ 173.-205] for student attendance.

■ The power to formulate rules to effect a policy of statute is legislative. The power to decide legal rights is judicial. [Mo.Const. Art. V, § 18, (1945) as amended at special election August 3, 1976; 2 Davis, Administrative Law Treatise, § 7.2 (2d ed.

1979)]. The validity of a rule is subject to review by declaratory judgment under § 536.050 [Rule 87.02(c)]. The validity of an adjudication is subject to review under § 536.100 [Rule 100.03] or § 536.150 [Rule 100.08]—according to whether a contested or noncontested case. Thus the enactment confides to CBHE two distinct functions of government, the legislative and the judicial. *State ex rel. Highway Commission v. Weinstein*, 322 S.W.2d 778, 785 (Mo. banc 1959). An agency statement of policy or interpretation of law of future effect which acts on unnamed and unspecified persons or facts is a *rule*. Rule 100.01. An agency decision which acts on a specific set of accrued facts and concludes only them is an *adjudication*. *Ackerman v. City of Creve Coeur*, 553 S.W.2d 490, 492[2] (Mo.App.1977).

■ The defendants contend, however, that an agency has discretion to give effect to the statutory purpose by either general rule-formulation or specific *ad hoc* adjudication and that CBHE chose the method of contested case adjudication to determine the *approved institution* status of the defendant colleges. These contentions, as those others asserted in the motions to dismiss—and the eventual judgment against the plaintiffs—are rife with misdirection. An agency no doubt has discretion to fill the interstices of the statute which gave the agency purpose, at discretion by rules or adjudications. 1 Cooper, State Administrative Law p. 180 (1965); *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). This litigation, however, does not pose theoretical questions of agency function or [except as introduced by defendants] whether the method adopted by the agency to determine *approved institution* responds to the requirements of law. The petition of the plaintiffs takes no issue, as such, with the *factual* determinations that the defendant colleges are *approved institutions*—other than that those adjudications were according to an illegal standard [the Purdy memorandum of year 1972] in violation of the express prohibitions

against religious and gender nondiscrimination of the statute [§ 173.205(2)(d)]. Rather, the litigation poses, simply: do the plaintiffs stand, in the venue chosen, to assert a claim for a declaratory judgment as to the validity and application of an agency rule—the year 1972 Purdy memorandum? The judgments of dismissal do not address the petition. They do not determine the sufficiency of the petition as a pleading for declaratory judgment of the validity of the year 1972 rule. They are distracted by the motions to dismiss which divert inquiry from the validity of an agency rule promulgated in year 1972 to an agency adjudication of *approved institutions* in year 1976.

Taken even on the premises assumed, the position of the defendants—that agency determination of *approved institutions* under the Program involves a *contested case*—has no legal sanction. The documents in the Exhibits Transcript show that CBHE was impelled by official advice to understand that the determination of *approved institution* involved "the due process rights of thousands of students [and so] required a hearing" as a contested case. Accordingly, the November, 1976, CBHE proceeding in Kirksville to determine *approved institution* status of defendant colleges Fontbonne, Rockhurst, Central Methodist, Southwest Baptist and William Jewell was conducted on the ostensible procedure of a "contested case." The other four defendant colleges, Culver-Stockton, Wentworth Military Academy, Westminster and William Woods, were sanctioned as *approved institutions* the month before, October, 1976, without hearing. The defendants do not say what interest of the student under the Program due process is bound to protect and, if so, why not a single student was made party to those adjudications. Nor do they say what interest the colleges have in the proceedings to protect,[27] or why only five of the defendant colleges were made party to the "contested case," or on what principle the four defendant colleges *not* party to the "contested case" assert that plaintiffs are precluded by that adjudication.

A *contested case* by definition [Rule 100.-01(3); § 536.010(2)] means: "a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing." The agency function under the Program enactment is fully and tersely defined in § 173.210 as merely to "select qualified recipients to receive financial assistance" on the basis of forms and criteria established by CBHE for attendance at an *approved institution* as determined by CBHE according to the standards of § 173.-205. The enactment requires no hearing. The defendants contend, the provisions of the Program enactment notwithstanding, that the due process rights of the student applicants are such a "requirement of law" which Rule 100.01(3) contemplates can be determined only after hearing.[28] That contention was answered authoritatively in

---

**27.** It is the sense of *Rogers* that the Program as enacted is constitutional on the face and does not infract Article X, § 3 and Article III, § 38(a) which prohibit the grant of public money to any private person, association or corporation, because the Program is not "in aid of" a private educational institution, nor, despite direct tuition to the student, a grant of public money to a private person [l.c. 721], but is for a *public purpose* [l.c. 719]. The institutional defendants do not say how they stand, under the *Rogers* rationale, to assert the public interest.

**28.** The students, we say again, were not joined in the November, 1976, determination of approved institutions and so that concern becomes only gratuitous. It is difficult to imagine what interest a student applicant might have in the determination of an *approved institution,* in any event. That Kirksville November, 1976, administrative proceeding becomes prominent on this appeal—we recapitulate—because the contention of the defendants that the court has no jurisdiction to entertain the declaratory judgment petition rests on the premise that their remedy was appeal within thirty days of the administrative decision of the November, 1976, "contested case" conducted in Kirksville. This they contend despite their antecedent contention that the plaintiffs "were not necessary parties to the administrative proceedings and thus have no standing to complain about any defects in notices or procedures employed by the Board." That is to say, the plaintiffs may

*State ex rel. Leggett v. Jensen*, 318 S.W.2d 353 (Mo. banc 1958). The court declared [l.c. 356[2]] that a *contested case* means an agency proceeding where legal rights, duties or privileges of specific parties are required by a positive constitutional or legislative enactment to be determined after hearing. The court further ruled [l.c. 358] that, in principle, "[d]ue process is satisfied if there be either an administrative hearing subject to judicial review or the right to have a hearing in a court which may adequately review the administrative decision." See, also, *Vorbeck v. McNeal*, 560 S.W.2d 245, 250[4, 5] (Mo.App.1977). Nor do the defendants bring themselves within the rationale of the *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ilk of a constitutionally protected interest in property or liberty which state action may not deny without notice and hearing.

Our law protects against the abuse of discretion which the concurrence of the legislative, judicial and executive functions in the administrative body may engender by a system of formal procedures—preeminently, the Administrative Procedure and Review Act. Thus, the classification of a *contested case* is left, not to the *ipse dixit* or invention of the agency, but as determined by law. The consequences of the improvised procedure adopted by the agency for the November, 1976, "hearing" are complaints by the plaintiffs [supported by the Wamble affidavit and Exhibits Transcript documents] that they were given no notice of the Kirksville proceeding by the method required by § 536.067 to a necessary party, and that neither they nor the institutional defendants were given notice of the decision by delivery or mail as required by § 536.090. The plaintiffs contest the contention of the defendants—adopted as ground for judgment of dismissal from the motions of defendants—that their claim

not sue for declaratory judgment because they were aggrieved by the administrative decision of November, 1976, but failed to appeal; but that they cannot complain about the legal in-

lapsed for failure to file petition for review "within thirty days of final decision" [§ 536.110.1 and Rule 100.04(a)] on the argument that the thirty-day prescription has not yet begun to run for want of agency notice of decision. The defendants respond that there was no want of notice to Wamble, that although formal notice did not issue, Wamble had actual awareness of the proceedings through the constant interchange of communication with the CBHE. The defendants mistake the purpose of the Wamble discussions with the agency. Those documents show that his inquiry to CBHE was not as to any specific determination of *approved institution*, as such, but as to an agency rule which he deemed the standards of the delegatory statute. This continued written exchange, rather, is akin to the comment procedure since adopted into the Administrative Procedure and Review Act [§§ 536.021 through 536.041]. That procedure subjects the rule-formulation power of an agency to public comment. [§ 536.021].

As we conclude, the petition of plaintiffs seeks declaratory judgment that the agency Purdy rule is invalid, and not a review from a contested case. We respond to the contested case contention because the judgments of dismissal adopt that insinuated issue. We conclude that the discussion of contested case is irrelevant to decision on the petition, but even if relevant, the procedures adopted by CBHE did not comport in fact nor in legal effect with a contested case. The several other arguments and refutations which stem from that mistaken premise, we leave. Our opinion as to those matters would be only advisory.

## INTEREST OF THE PLAINTIFFS TO RAISE GENDER DISCRIMINATION AGAINST WENTWORTH

█ There remains the correctness of the judgment of dismissal of the petition

sufficiencies of the administrative proceeding because they had no sufficient interest in the first place.

against defendant Wentworth on the ground that Wentworth, unlike all the other college defendants, "is not affiliated with any religious sect." The incidence of the Purdy rule invalidity the plaintiffs allege against Wentworth is the violation of the sex nondiscrimination component of § 173.-205(2)(d) of the Program enactment. That statute forbids an *approved institution* to discriminate in the admission of students on the basis of "race, color, religion, sex or national origin," alike. An agency rule becomes equally invalid for infraction of one, as for any other, component of the statutory guides. It follows as well, that an expenditure of public funds in violation of law—whatever the illegality—suffices to give a taxpayer status for a declaratory judgment and injunction against the illicit public action. As our discussion shows, a taxpayer may maintain such suit on behalf of the class where the unlawful expenditure of public money results from an infraction of statute [*Stocke v. Edwards*, 295 Mo. 402, 244 S.W. 802 (banc 1922)—the state election law; *Harris v. Langford*, 277 Mo. 527, 211 S.W. 19 (1919)—statute on deposits of county funds; *Castilo v. State Highway Commission*, supra,—statutory power to locate roads] as well as where the illegality results from violation of constitutional provision. [*Berghorn v. Reorganized School District No. 8*, supra; *Harfst v. Hoegen*, supra.]

The plaintiffs sue as taxpayers on allegations that the CBHE rule which exempts colleges, in particulars, from the religious and gender nondiscrimination directs of § 173.205(2)(d) and grants them status as *approved institutions* results in the unlawful expenditure of public money. Those allegations of petition suffice to accord the plaintiffs status to sue under § 536.050.1 and Rule 87.02(c) for declaratory judgment as to the validity of the agency rule. The petition rests properly in Jackson County at the option of plaintiff Edwards, a resident in the venue.

The judgments of dismissal as to all the defendants are set aside and the petition of the plaintiffs is ordered reinstated.

The cause is reversed and remanded for further proceedings.

All concur.